**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA; and BOBBY HARDWICK, WALTER
BERRY, RAYMOND J. MITCHELL, FAY
BARKLEY, ARLEN BANKS, YVONNE HICKS,
and BRUCE CARRIER on behalf of themselves
and all other persons similarly situated,

        Plaintiffs,

v.                                   Case No. 07-CV-14845

FORD MOTOR COMPANY,          CLASS ACTION

        Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The parties in this health care benefits class action have presented a proposed

global settlement to the court.  Members of the class had the opportunity to submit

written objections, as well as oral objections during a July 10, 2008 fairness hearing.

After the hearing, the parties submitted joint proposed findings of fact and conclusions

of law in support of final approval of the class action settlement.  The court has

thoroughly reviewed these mostly uncontested findings of fact and conclusions of law.

The court will adopt them with some modification and reject all objections inconsistent

with these findings of fact and conclusions of law.

# I. FINDINGS OF FACT

## A. The Parties

1.      The individual plaintiffs in this action are Bobby Hardwick, Walter Berry, Raymond J. Mitchell, Fay Barkley, Arlen Banks, Yvonne Hicks, and Bruce Carrier ("Class Representatives").

2.      The International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") is also a plaintiff in this action.

3.      The defendant is the Ford Motor Company ("Ford").

4.      Ford and the UAW are parties to a series of collective bargaining agreements ("CBAs"), under which Ford provides health care benefits to qualifying hourly retirees and their spouses, surviving spouses, and dependents. The Class Representatives represent a class of these retirees, spouses, and dependents. Each receives health care benefits in retirement provided by Ford.

5.      Plaintiff Hardwick was employed by Ford in Lorain, Ohio for twenty-nine years until his retirement in 1997. (Decl. of Bobby Hardwick, Dkt. # 23-18.) Mr. Hardwick was appointed by this Court as a class representative in the case of *UAW v. Ford Motor Corp.*, Case No. 05-74730 (E.D. Mich.) ("*Hardwick I*"). (*Id.*)

6.      Plaintiff Berry was employed by Ford in Indianapolis, Indiana for twenty-four years until his retirement in 1987. (Decl. of Walter Berry, Dkt. # 23-19.) Mr. Berry was appointed by this Court as a class representative in *Hardwick I*,. (*Id.*)

7.      Plaintiff Mitchell was employed by Ford in Wayne and Allen Park, Michigan for thirty-three years until his retirement in 1998. (Decl. of Raymond J.

Mitchell, Dkt. # 23-20.)  Mr. Mitchell was appointed by this Court as a class

representative in *Hardwick I*.  (*Id.*)

8.  Plaintiff Barkley was employed by Ford in Sterling Heights, Michigan for

more than thirty years until her retirement in 1988.  (Decl. of Fay Barkley, Dkt # 24.)

Ms. Barkley was appointed by this Court as a class representative in *Hardwick I*.  (*Id.*)

9.  Plaintiff Banks was employed by Ford in Long Beach, California for more

than twenty-eight years until his retirement in 1980.  (Declaration of Arlen Banks, Dkt. #

23-2.)  Mr. Banks was appointed by this Court as a class representative in *Hardwick I*.

(*Id.*)

10.  Plaintiff Hicks's late husband, Samuel Hicks, was employed by Ford in

Sharonville, Ohio for more than twenty-one years until his retirement in 1980.  (Decl. of

Yvonne Hicks, Dkt. # 23-22.)  Plaintiff Hicks's husband died in 2005.  (*Id.*)  Plaintiff

Hicks was appointed by this Court as a class representative in *Hardwick I*.  (*Id.*)

11.  Plaintiff Carrier was employed by Ford in Woodhaven, Michigan for more

than thirty years until his retirement in 2006.  (Decl. of Bruce Carrier, Dkt. # 23-23.).

### B.  The Certified Class

12.  On April 7, 2008, this Court entered an order approving these plaintiffs as

Class Representatives of a Class defined as:

> (i)  Ford-UAW Represented Employees who, as of November
> 19, 2007, were retired from Ford with eligibility for Retiree
> Medical Benefits under the Ford Retiree Health Plan, and
> their eligible spouses, surviving spouses and dependents;
>
> (ii)  surviving spouses and dependents of any Ford-UAW
> Represented Employees who attained seniority and died on
> or prior to November 19, 2007 under circumstances where

3

such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from Ford and/or under the Ford Retiree Health Plan;

(iii)    former Ford-UAW Represented Employees or UAW-represented employees who, as of November 19, 2007, were retired from any previously sold, closed, divested or spun-off Ford business unit with eligibility to receive Retiree Medical Benefits from Ford and/or the Ford Retiree Health Plan by virtue of any agreement(s) between Ford and the UAW, and their eligible spouses, surviving spouses, and dependents; [and]

(iv)    surviving spouses and dependents of any former Ford-UAW Represented Employee or UAW-represented employee of a previously sold, closed, divested or spun-off Ford business unit, who attained seniority and died on or prior to November 19, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from Ford and/or the Ford Retiree Health Plan.

(Order Granting Class Representatives' Mot. for Class Certification, Dkt. # 30.)

13.    Members of the Class ("Class Members") and the Class Representatives are represented in this proceeding by William T. Payne, John Stember, Edward J. Feinstein, Ellen Doyle, Pamina Ewing, and Stephen M. Pincus (collectively "Class Counsel") of Stember Feinstein Doyle & Payne, LLC.

## C. The *Hardwick I* Settlement

14.    In 2005, Ford was providing retiree health care benefits to the Class Representatives and a class of approximately 170,000 retirees, spouses, and dependents pursuant to the terms of CBAs negotiated with Ford by the UAW. ((4/7/08 Decl. of William T. Payne, Dkt. # 23-3 at ¶ 2) ("Payne Decl.").)

15.    As the costs of providing retiree health care benefits escalated and Ford's financial condition worsened in the face of increased international competition, Ford

announced that it unilaterally would modify retiree health care benefits. (Am. Compl. at ¶ 26, Dkt. # 28.)

16.     After that announcement, the UAW and Class Representatives Bobby Hardwick and Walter Berry filed a complaint in this Court against Ford, which they amended on December 27, 2005, in part to add plaintiffs Raymond J. Mitchell, Fay Barkley, Arlen Banks, and Yvonne Hicks. (Payne Decl. at ¶ 4.)[1] Plaintiffs sought an injunction and a declaration that retiree health care benefits are vested and unalterable. (Am. Compl. at ¶ 26, Dkt. # 28.)

17.     Six of the seven individual named plaintiffs who are Class Representatives in the present action, "*Hardwick II*", served as class representatives in *Hardwick I*. (*Id.*) The seventh Class Representative in this *Hardwick II* action – Bruce Carrier – retired after the cut-off date for inclusion in the class. (*Id.* at ¶ 12.) In this new lawsuit, persons in Plaintiff Carrier's category are included in an expanded class. (*Id.*) The expanded class consists of about 187,000 persons. (Decl. of Jose Fraga at ¶ 5, Dkt. # 44-7.)

18.     The parties eventually entered into a proposed class action settlement agreement that retained comprehensive benefits with only modest cost sharing by retirees. *See UAW v. Ford Motor Co.*, Nos. 05-74730, 06-10331, 2006 WL 1984363 at *10-12, *23 (E.D. Mich. July 13, 2006) ("*Hardwick I*"), aff'd, 497 F3d 615 (6th Cir. 2007). The *Hardwick I* Settlement Agreement also provided for the creation of a voluntary employee benefit association trust (also known as a "VEBA"), to be funded by cash and

---

[1] Carl Maltifano was also a plaintiff and class representative in *Hardwick I*. For health reasons, Mr. Maltifano was not able to continue to serve as a class representative, and accordingly has not appeared as a plaintiff in this action.

other contributions by Ford, and by contributions by active Ford employees through wage deferrals and diversion of cost-of-living adjustments (the "Existing External VEBA"). *Id.* at *12. The Existing External VEBA was designed to reduce the monthly contributions, deductibles, and other costs that would otherwise be borne by retirees under the agreement. *Id.* at *10-12.

19.     After notice to the Class and a fairness hearing pursuant to Federal Rule of Civil Procedure 23(e), the court certified a class of former Ford/UAW employees (and their spouses, surviving spouses and dependents) who as of December 22, 2005, were eligible for retiree health care benefits because of the former employee's retirement (or death before retirement). *See id.* at *21. The court thoroughly considered the parties' evidence and all objections (made by a very small percentage of the class), and approved the proposed settlement agreement, finding it was "fair, reasonable, and adequate." *Id.* at *21-40, *41. The Sixth Circuit affirmed. *See UAW v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007) (consolidated appeal) ("*Hardwick I* Appeal").

### D.  Ford's Continuing Financial Struggle

20.     Despite the *Hardwick I* settlement, Ford's financial struggle continues. (*See, e.g.*, Decl. of Peter J. Daniel at ¶ 8, Dkt. # 44-3 ("Daniel Decl."); Decl. of Barbara A. Benson at ¶ 6, Dkt. # 44-4 ("Benson Decl.").) Over the past several years, Ford as a whole and specifically its North American automotive division, the company's largest and most significant business unit, have sustained considerable financial losses and at times the company has faced financial crisis. (Daniel Decl. at ¶ 3.)

21.     In 2005, Ford's North American automotive business reported a loss from continuing operations before income taxes of $2.5 billion, with Ford reporting an overall

net income of $1.4 billion.  (*Id.* at ¶ 4.)  In 2006, Ford lost more than $12.6 billion, with consolidated Ford automotive operations reporting an overall pre-tax loss of $17 billion, including a $16 billion pre-tax loss in North America.  (*Id.*)  And in 2007, Ford had a company-wide net loss of $2.7 billion, with consolidated automotive operations experiencing a pre-tax loss of $5 billion, including a $4.2 billion pre-tax loss in North America.  (*Id.*)

22.     Ford's financial performance in 2008 initially appeared to be on the upswing, with the company reporting that it earned $100 million in the first quarter and had a pre-tax profit of $316 million, despite $445 million of pre-tax losses in its North American automotive sector.  (*Id.* at ¶ 5.)  However, due largely to depressed sales resulting from general economic conditions, including the escalating price of gasoline over the first six months of the year, Ford's financial performance has since weakened. (*Id.*)  To address these conditions, the company recently announced that it would cut production by 25% in the third quarter and 8-14% in the fourth quarter.  (*Id.*)  It is now expected that for the full year, its pre-tax losses will be worse than in 2007.  (*Id.*) Indeed, as widely reported in the press, on July 24, 2008, Ford reported that it lost over $8.7 billion, including special items, in the second quarter.  See, e.g., Bill Vlasic & Nick Bunkley, *At Ford, End of a Big-Vehicle Era Takes a Toll*, New York Times (Jul. 25, 2008).

23.     Ford's financial and competitive problems have adversely affected the value of its business, which has continued to decline dramatically.  (*Id.*)  In this decade alone, Ford's market capitalization – a measure of the company's value as determined

by the market price of its outstanding shares of stock – has fallen from $60 billion at the end of 1999 to approximately $12 billion currently.    (Daniel Decl. at ¶ 7.)

24.     Ford's investment-grade rating has declined as a result of its financial difficulties.  (*Id.* at ¶ 8.)  As recently as 2000, Ford's investment grade rating was "A+," well within what is regarded as "investment grade."  (*Id.*)  By March 2005, Ford's credit rating had been downgraded to non-investment grade or "junk" bond status, and today Ford's credit ratings remain several levels below investment grade, with Standard & Poor's rating the company at a "CCC+," and Moody's rating it at "Caa1."  (*Id.*)  This significant and sustained deterioration in the company's credit rating has exacerbated its financial condition by limiting Ford's access to the capital required to fund its businesses and, where capital is available, by making it significantly more costly.  (*Id.*)

25.     Ford's continuing financial troubles reflect a longer business trend.  In general, Ford's position in the U.S. market has significantly declined over recent years. (*Id.* at ¶ 6.)  Twelve years ago, Ford had a 25% share of the U.S. automobile market. (*Id.*)  Since then, with the entry of numerous new vehicle brands in North America, Ford's U.S. market share has eroded to only 14.6% in 2007.  (*Id.*)

### E.  The Role of Retiree Health Care Costs in Ford's Financial Struggle

#### (1)  Ford's Other Post Employment Benefit ("OPEB") Liability

26.     Ford is one of the largest private purchasers of health care in the U.S., providing health care benefits to, among others, approximately 535,000 employees, retirees, and their dependents, and Ford's health care costs have a significant impact on its business and financial condition.  (See Benson Decl. at ¶¶ 3-5, Dkt. # 44-4.)  Ford provides retiree health care benefits on a "defined benefit plan" basis, meaning that

benefits are provided according to the described coverage, not a specific dollar amount. (*Id.* at ¶ 3.)

27. Ford's future financial responsibility for coverage under a defined benefit plan is reflected on the company's balance sheet in the form of OPEB obligation. (*Id.*) The largest portion of Ford's OPEB liability is attributable to hourly retiree health care. (*Id.*)

28. Ford's OPEB obligation extends far into the future, and numerous different variables influence its calculation, including mortality rates, health care inflation rates, and asset return rates, so there is substantial uncertainty surrounding an assessment or appraisal of the OPEB obligation. (*Id.* at ¶ 5.) This uncertainty over the extent of Ford's OPEB obligation adversely affects lending institutions' assessment of the company's creditworthiness and poses significant challenges to its business. (*Id.*)

29. Because vast numbers of persons, including retirees, employees, spouses and dependents, are eligible to receive post-employment health care from Ford, the company's OPEB obligation is staggering. (*Id.* at ¶ 4.) When compared to the OPEB of other American public companies, Ford's OPEB obligation is one of the largest. (*Id.*) Across Fortune 50 companies generally, the OPEB obligation is on average less than 20% of market capitalization and approximately 5% of revenues. Ford's OPEB obligation, by contrast, is about two times the value of the company itself as measured by the market value of its stock, and is equal to 16% of its annual revenue. (*Id.*)

## (2)  The Impact of OPEB Liability and Health Care
## Costs on Ford's Financial Condition and Business

30.     Ford's financial position is problematic for many reasons.  One significant reason is that Ford's OPEB obligation and health care costs continue to adversely impact Ford's financial health and ability to compete.  Lenders generally are unwilling to accept the risk associated with Ford's uncertain but enormous OPEB liability, which is one of the principal reasons why Ford's credit rating remains well below investment grade, limiting its access to capital for its business operations.  (*Id.* at ¶ 6; Daniel Decl. at ¶ 8, Dkt. # 44-3.)

31.     Ford's health care cost has been a significant factor in weakening investor confidence in the company's financial condition, as evidenced by the substantial decline in its market capitalization.  (Benson Decl. at ¶¶ 7, 10.)

32.     Because many of Ford's current competitors lack the legacy expense – including, in particular, health care – of long-established companies like Ford, these competitors continue to have a significant pricing and competitive advantage.  (*Id.* at ¶ 6.)  For example, in assessing a company's competitiveness, analysts often compare their total labor costs including benefits for active and retired workers and dependents, on a per-hour basis.  In 2007, Ford's total per-hour labor cost was approximately $25 to $30 (or some 30%) greater than the estimated total U.S. labor cost per hour for Japanese auto manufacturers (e.g., Toyota, Honda, and Nissan).  (*Id.*)

33.     Ford's health care obligation has a negative impact on its business in two fundamental respects.  First, it continues to divert enormous amounts of needed resources away from business operations.  Second, it erodes investor confidence,

thereby increasing the resources needed to fuel those operations.  (Daniel Decl. at ¶ 11, Dkt. # 44-3.)  At a critical time when significant investment is needed to meet emerging federal fuel efficiency requirements, Ford's retiree health care obligation has seriously constrained its ability to invest in new plant machinery and equipment, as well as alternative propulsion technologies, on a scale equivalent to Ford's key competitors. (*Id.*)

34.      Although the *Hardwick I* Settlement Agreement provided Ford with a measure of annual cost reductions, Ford expects that its OPEB obligation will continue to severely limit the company's access to unsecured capital resources, eroding its already precarious financial condition.  (*See* Benson Decl. at ¶ 6, Dkt. # 44-4; Daniel Decl. at ¶¶ 11-13, Dkt. # 44-3.)  Without access to unsecured debt markets, Ford must resort to asset sales or secured debt funding, which greatly diminishes its flexibility, increases its costs and reduces its ability to withstand weaker periods of the business cycle.  (Benson Decl. at ¶ 6, Dkt. # 44-4.)

35.      Ford submitted evidence of its continued efforts to address its financial condition through significant operational changes, intended to both reduce costs and improve its market share.  (*Id.* at ¶ 9.)  For example, Ford has reduced structural costs by over $3 billion annually.  (*Id.*)  At the same time, Ford has introduced several new or revamped vehicle models in the past year that have been well received by commentators and consumers alike, such as the Ford Taurus, Taurus X, Ford Focus, Mustang Bullitt, Mercury Sable and Ford F-Series Super Duty.  (*Id.*)  In addition, Ford is aggressively pursuing the next generation of alternative fuel technology, including the

turbocharged direct injection system known as EcoBoost, as well as plug-in hybrids, fuel cells, hydrogen internal combustion engines, and other advanced technologies.  (*Id.*)

**F. Ford's Business and Its Impact on Michigan and Other Communities**

36.     Despite its struggles, Ford remains one of America's largest employers. (Daniel Decl. at ¶ 15, Dkt. # 44-3.)  Either directly or indirectly, more than 250,000 Americans earn their living building, marketing and selling Ford cars and trucks; over 195,000 retirees and surviving spouses receive a pension from Ford, and more than 535,000 salaried and hourly retirees and their dependents receive health care from Ford.  (*Id.* at ¶ 15; *see* Benson Decl. at ¶ 3, Dkt. # 44-4.)

37.     Given its size, Ford is vital to the economies of southeast Michigan, the State of Michigan, and other communities in the United States.  As one of Michigan's largest employers, the company operates from numerous site locations statewide, directly employing over 65,000 Michigan residents with an annual payroll of $5 billion. (Benson Decl. at ¶ 13, Dkt. # 44-4; Daniel Decl. at ¶ 15, Dkt. # 44-3.)  Ford's North American automotive operations spend approximately $45 billion annually in supply and materials purchases, with the vast majority (about $38 billion each year) from a base of about 1,800 U.S. suppliers.  (Decl. of Steve Jones at ¶ 2, Dkt. # 44-5, ("Jones Decl.")).  More than 800 of Ford's U.S. suppliers are located in Michigan, accounting for about $15 billion in purchases.  (Id. at ¶ 3.)  Many of Ford's U.S. suppliers themselves are large manufacturers which have a multitude of employees and retirees residing in Michigan.  (*Id.*)  These manufacturers include Lear, Johnson Controls, Visteon, Dana, Magna International, Bosch, TRW Automotive, and Delphi.  (*Id.*)  Ford annually makes

purchases from these manufacturers of approximately $6 billion. (*Id.*; *see also* Daniel Decl. at ¶15, Dkt. # 44-3.)

38.    Beyond Michigan, Ford operates vehicle assembly plants and other facilities in 24 states and maintains other operations throughout the country. (Daniel Decl. at ¶ 15, Dkt. # 44-3.) In the past five years alone, Ford has made capital investments totaling more than $14.5 billion in the U.S., and purchased hundreds of billions of dollars in parts and supplies. (*Id.* at ¶ 16.) Ford spends more than $7.5 billion annually in research and development. (*Id.*)

## G.  Events Leading to *Hardwick II*

39.    In 2007, Ford announced that it would terminate the *Hardwick I* Settlement Agreement at the end of 2011 and unilaterally would reduce retirees' benefits at that time. (Payne Decl. at ¶ 11, Dkt. # 44-3.)

40.    During negotiations between Ford and the UAW in 2007, the UAW and Ford discussed the prospect of establishing a new VEBA completely independent of Ford, with increased funding that would assume total responsibility for providing retiree health care ("New VEBA"). (*Id.* at ¶ 12.)

41.    The Ford/UAW discussions, as well as discussions between UAW and General Motors Corporation ("GM") and Chrysler LLC ("Chrysler'), resulted in a tentative agreement that had the following basic features:

> (a)    Assuming that Class Representatives, Class Counsel and the Court approved the settlements involving Ford, GM, and Chrysler, the automobile companies would ultimately pay amounts into a New VEBA fund that would likely total close to $60 billion, and the New VEBA would assume responsibility for providing retiree health benefits starting in 2010, with each of the three groups in separate plans funded

13

by separate sub-accounts. The likely amount of payments to the Ford sub-account within the proposed New VEBA was found to be in a likely range between $13.3 billion and $15 billion, the approximate present value as of January 2008.

(b)     Assuming approval, the automobile companies would also continue to pay all benefits before the New VEBA takes over in 2010 at an estimated cost of $9 billion on a present value basis for all three companies, and $2.3 billion for Ford.

(c)     An excellent program of retiree health benefits (continuing what had been negotiated in the *Hardwick I* lawsuit) would remain in place at the same levels at least through 2011. Whether benefits or participant contributions for the Class Members and Covered Group would have to be adjusted by the New VEBA fiduciaries thereafter would depend on many factors, including whether Ford remains financially viable so that it can make the required payments on time, the value of the Ford notes to be contributed to the New VEBA, the New VEBA fund's return on investment, inflation in medical costs, and whether new or existing government health care programs are implemented or improved (which could actually result in benefits being improved).

(*Id.*)

42.     The *Hardwick I* Class Representatives objected to Ford's announcement that it would terminate the *Hardwick I* Settlement Agreement in 2011 and thereafter unilaterally reduce retirees' health care benefits. (*Id.* at ¶ 13.) They authorized Class Counsel to bring another lawsuit contending that their retiree benefits are vested and that any unilateral reduction of benefits would violate the relevant CBAs. (*Id.*) The *Hardwick I* Class Representatives also authorized Class Counsel to seek to re-open *Hardwick I*. (*Id.*)

43.     Plaintiff Bruce Carrier (a 2006 retiree) authorized Class Counsel to add him as an additional Class Representative in the new litigation. (*Id.* at ¶ 14.)

**H.  Plaintiffs' Claims and Ford's Response**

44.     The Class Representatives, together with the UAW as a co-Plaintiff, filed this action, *Hardwick II*, on November 9, 2007.  (Compl., Dkt. # 1.)  Plaintiffs amended the complaint on April 25, 2008.

45.     Plaintiffs brought Count I of the Amended Complaint under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, seeking a declaration that retiree health care benefits cannot be unilaterally terminated or modified by Ford, and a permanent injunction prohibiting such termination or modification.  (Am. Compl.  at ¶ 36, Dkt. # 28.)

46.     In Count II, the Class Representatives asserted a claim under §§ 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3), seeking the same declaratory and injunctive relief as Count I.  (*Id.* at ¶ 39.)

47.     Ford filed its Answer and Affirmative Defenses to the Amended Complaint ("Answer") on May 12, 2008.  (Answer to Am. Compl., Dkt. # 32.)  In its Answer, Ford denied that the retiree health care benefits it provides are vested benefits that Ford cannot unilaterally modify or terminate.  (*Id.* ¶¶ 6-13, 24.)  Ford also asserted affirmative defenses, including that the Plaintiffs' claims are barred by the terms of the CBAs, as well as by acquiescence, waiver, ratification and/or estoppel.  (*Id.* at ¶¶ 1-9.)

### I.  The Parties' Negotiations

48.     In connection with the 2007 negotiations, Ford provided the UAW with extensive information about its financial condition and health care expenditures.  (Settlement Agreement § 3, Dkt. # 19-3.)  This information was reviewed by the UAW and by its advisors, including investment bankers, actuaries, and legal experts, who

assessed Ford's financial condition and analyzed the benefits of the proposed arrangement and the funds necessary to provide ongoing retiree health care benefits. (*Id.*)  Representatives of the UAW and its team of advisors also met with Ford officials, who answered questions and provided further detail, as requested.  (*Id.*)

49.     The UAW and Ford entered into a memorandum of understanding ("MOU") provisionally resolving their dispute on November 3, 2007.  (Mem. of Understanding, Post-Retirement Med. Care, Dkt. # 21-2.)  The MOU established a framework for a full and complete settlement of their dispute concerning retiree health care.  (*Id.*)

50.     Active Ford-UAW employees ratified the MOU effective November 19, 2007.  (*See*, *e.g.*, Katie Merx, *UAW Ratifies Ford Contract*, Detroit Free Press, Nov. 14, 2007, Abram Decl. at Ex. B., Dkt. # 21-2.)

51.     The proposed framework for settlement was contingent on approval by Class Counsel following Class Counsel's independent investigation.  Class Counsel and their retained experts were provided full access to all relevant financial, actuarial and other information maintained by or exchanged between Ford and UAW, as well as reports prepared by the UAW's experts, and with the assistance of their retained experts, undertook their own independent review and analysis of Ford's financial condition and the possibility of settlement.  (Payne Decl. at ¶¶ 38-39, 41-44, Dkt. # 23-3.)

52.     Even after Class Counsel completed their investigation and approved the framework, many details remained to be negotiated among the parties.  (*Id.* at ¶ 35.)

53.     Class Counsel, the UAW, and Ford negotiated a detailed, comprehensive agreement: the April 7, 2008 Settlement Agreement presented to this Court with the Joint Motion for Preliminary Approval of Class Action Settlement Agreement and Proposed Class Notice.  (See Dkt. # 19-3.)

54.     Class Counsel was an active participant and negotiated directly with Ford and the UAW regarding matters in addition to or different from what was in the MOU.  (Payne Decl. at ¶ 35, Dkt. # 44-3.)  Among the items Class Counsel helped to negotiate, which are in addition to or different from what was in the MOU, are standards for investment management once the New VEBA is established.  (*Id.*)

55.     The parties' detailed negotiations resulted in the written Settlement Agreement filed with this Court on April 7, 2008.  (*Hardwick II* Settlement Agreement, Dkt. # 19-3.)  The court will refer to this final agreement as the "2008 Settlement Agreement" or the "2008 Settlement."

### J.  Investigation by the UAW and Class Counsel of the Likelihood of a Ford Default in the Future and Adequacy of Proposed Funding of the New VEBA

56.     As noted above, before entering into the MOU, the UAW retained experts to advise about the risk of a future Ford default on retiree health obligations.

57.     The UAW retained Lazard Frères & Co., LLC ("Lazard") to perform the financial analysis, and Milliman to perform the actuarial analysis.  Each company is among the leaders in its respective field.

58.     The evidence demonstrates that Ford gave the Class, the UAW, and their advisors access to a large quantity of confidential and actuarial information, including

confidential projections and business plans.  (Decl. of Jim Millstein at ¶ 8, Dkt. # 42 ("Millstein Decl.").)

59.     Ford's actuaries provided Milliman with their own model for projecting health care benefit costs into the future, along with historical plan costs and demographic information about the individuals who would be entitled to benefits under the proposed settlement.  Lazard and Milliman prepared independent financial models to analyze the funding requirements and adequacy of the proposed New VEBA.  (Decl. of Suzanne Taranto at ¶¶ 7-9, Dkt. # 43 ("Taranto Decl.").)

60.     Lazard concluded that "Ford's financial position was and remains precarious, notwithstanding its strong liquidity and international operations, its recent cost savings initiatives in North America, its successful new product launches and a recent tender offer for Ford shares by Kirk Kerkorian."  (Millstein Decl. at ¶ 12, Dkt. # 42.)  Lazard recommended to the UAW "that it explore the establishment of a VEBA trust to assume Ford's health care obligations to UAW retirees so as to mitigate the adverse impact that further deterioration in Ford's financial position and credit quality could have on Ford's ability to meet its obligations in respect of post-retirement health care to its UAW retirees."  (*Id.* at ¶ 13.)

61.     Lazard also assisted the UAW in negotiating greater value from Ford in contributions to the New VEBA than Ford had offered.  (Millstein Decl. at ¶¶ 14-19.)  Although Ford reported a profit on its worldwide operations in the first quarter of 2008, Millstein's Declaration reports that Lazard's assessment of Ford's financial condition as of early July 2008 is no better than it was when the parties reached their agreement.  "In fact, Lazard's concerns regarding the achievability of Ford's Plan have been

subsequently validated, as Ford's financial performance has continued to deteriorate in 2008.  Ford's highly leveraged balance sheet and low credit ratings leave it highly vulnerable and at risk of financial distress, especially given the difficult economic and industry environment."  (*Id.* at ¶ 12.)

62.     Milliman examined the assumptions that were used in the negotiations between Ford and UAW.  (Taranto Decl. at ¶¶ 6, 8, Dkt. # 43.)  With respect to the assumption that the VEBA assets would earn 9 percent annually on investments, Milliman tested some sample expected hypothetical investment portfolios to determine the likelihood of achieving a 9 percent long-term investment return.  Milliman reported:

> Based on a weighted average payment duration of approximately 12 years, and a "traditional" 60% equity 40% fixed income portfolio, we determined that a 9% return represents just under the 75th percentile of expected returns (i.e., the hypothetical portfolios would achieve a compounded annual long-term return of 9% or greater over their lifetime about 25% of the time).  More significantly, we reviewed other hypothetical investment portfolios with investment policies comparable to those of very large pension funds (which would more closely approximate our expectation for an investment policy appropriate for a trust of this size), and found that the 9% return represented just over the 50th percentile of returns (i.e., the hypothetical portfolios would achieve a compounded annual long-term return of 9% or greater over their lifetime about 50% of the time).

(*Id.* ¶ 8.)  Milliman concluded that the other assumptions about future experience, including life expectancy and future medical cost inflation, were also within a reasonable range.  (*Id.* at ¶ 6, App'x A.)  After modeling the future solvency of the New VEBA under various proposals and assumptions, Milliman advised the UAW that using the negotiators' assumptions, "the VEBA is projected to have sufficient assets to provide the

benefits anticipated in the current settlement agreement over the lifetime of the covered group of current and future retirees."  (*Id.* ¶ 14.)[2]

63.     Lazard similarly concluded that "[b]ased on the assumptions in the VEBA model (including the convertible note valuation) and the settlement terms agreed to by the UAW and Ford, the VEBA model forecasted solvency throughout the lives of all covered employees with no modifications to benefits and only a slight assumed increase in the cap on annual escalation of retiree contributions, deductibles and out-of-pocket maximums from 3% to 4% in 2016."  (Millstein Decl. at ¶ 19, Dkt. # 42.)

64.     Independent of the UAW, Class Counsel also thoroughly reviewed the fairness, reasonableness and adequacy of the proposed settlement.  To facilitate this review, UAW and Ford granted Class Counsel full access to all relevant financial and actuarial materials, and to all documents that Class Counsel requested relating to UAW health care.  (Payne Decl. at ¶ 39, Dkt. # 23-3.)  Class Counsel again considered applicable law, and engaged in extensive discussions with the UAW experts and Ford representatives.  (*Id.*)  Class Counsel retained their own experts, reviewed material concerning Ford's health care costs, and analyzed relevant health care documents and collective bargaining agreements.  (*Id.*)  Class Counsel's experts also conferred directly with the UAW's experts.  (*Id.*)

65.     Based on Class Counsel's investigation in Hardwick I, Class Counsel had concluded that Ford faced ongoing and very serious financial difficulties.  The further

---

[2]For purposes of modeling the solvency of the VEBA, the values of the Convertible Note and Second Term Lien Note were determined by Lazard.  Milliman did not verify or offer any conclusions with respect to the valuation of those instruments. (Taranto Decl. at ¶ 9, Dkt. # 43.)

analysis Class Counsel conducted in Hardwick II showed that these difficulties remained and would continue. (*Id.* at ¶ 40.) Class Counsel has stated that Ford's financial condition was a compelling factor in Class Counsel's decision to approve the basic concept set forth in the MOU, and to negotiate and enter into the 2008 Settlement Agreement. (*Id.* at ¶ 41.) Class Counsel concluded that no matter how strong the legal claim is on the merits, Class Members still would be vulnerable if there is a significant risk that Ford will become insolvent and unable to pay the level of benefits that the Class Members anticipate receiving over their projected life expectancy. (*Id.*)

66.     To analyze Ford's financial prospects in connection with *Hardwick I*, Class Counsel retained John D. Finnerty, Ph.D., Managing Principal of Finnerty Economic Consulting, LLC, and Professor of Finance and Director of the MS in Finance Program at Fordham University in New York. (Decl. of William T. Payne in Supp. of Mot. for Final Approval of Class Action Settlement at ¶ 3, Dkt. # 41-3 ("Payne Final Approval Decl.").) Dr. Finnerty's Expert Report ("Finnerty Report"), and exhibits and appendices showing his qualifications and listing the materials he considered, are found in the record at Dkt. # 41-4.

67.     Dr. Finnerty concluded that the likelihood of a Ford default on its senior debt within one year is between 6.40 percent and 26.29 percent. The likelihood of default within two years is between 13.82 percent and 34.73 percent. It is between 20.00 percent and 39.96 percent for a three-year time horizon, between 25.74 percent and 44.22 percent for a four-year time horizon, between 27.40 percent and 51.52 percent for a five-year time horizon, when the Ford Convertible Debentures are scheduled to mature, and between 35.18 percent and 59.29 percent for a 10-year time

horizon, when the Term Note is scheduled to mature. (Finnerty Report at ¶ 27, Dkt. # 41-4.)

68. Based on Dr. Finnerty's evaluation of the possibility of a Ford default, Class Counsel concluded that a discounted settlement worth less than the "full value" that Plaintiffs might win through a court determination would be justified here. (Payne Decl. at ¶ 44, Dkt. # 23-3.) In addition, Class Counsel concluded that a discounted settlement worth less than "full value" was justified due to the risks of ultimately losing the litigation. (*Id.* at ¶ 45.)

69. In addition to considering the prospects of a Ford bankruptcy and the prospects of losing the lawsuit on the merits, Class Counsel also considered (1) the range of likely payments into the New VEBA and (2) the range of anticipated *Hardwick I* benefits that the New VEBA would likely be able to provide starting in 2012. (*Id.* at ¶ 46.) For these estimates and analysis, Class Counsel relied on the expert advice of health care actuary Adam Reese, FSA, EA, MAAA, and the Hay Group, where Mr. Reese is a Senior Consultant. (*Id.*) A redacted version of the final Hay Group Report, dated June 17, 2008, is found in the record at Dkt. # 41-5.

70. The Hay Group independently evaluated the actuarial assumptions that were used in the UAW/Ford negotiations and independently examined the value of the agreed contributions to the New VEBA. As noted above, the amount likely to be paid into the New VEBA is in a likely range between $13.299 billion and $14.965 billion, not including the $2.3 billion Ford is projected to pay in benefits before 2010.

71. According to Class Counsel's actuarial experts, it is difficult to predict whether these amounts paid into the New VEBA will be enough to pay all anticipated

benefits without adding more retiree contributions or reducing benefits. (Payne Decl. at ¶ 41, Dkt. # 23-3.) This is because future New VEBA funding and expenditures inherently are uncertain due to such factors as (1) future investment returns and volatility of returns, (2) future healthcare costs and variation of rates of increase in those costs, (3) changes in Medicare, (4) the possibility of government-paid national health benefits, (5) mortality experience of the retirees and (6) bankruptcy. (Hay Group Report at 15, Dkt. # 41-5.) Considering that uncertainty, the Hay Group estimated how variations in the primary factors would affect the New VEBA's ability to continue providing benefits at the Modified Plan level. Under certain plausible conditions, the New VEBA would be expected to continue providing those benefits for as long as the retirees and dependents are alive to receive them. Under other plausible conditions, the Hay Group projected that the Committee would have to reduce benefits at some point in the future in order to continue providing significant benefits for as long as they will be needed. (*Id.* at 14-15; Payne Decl. at ¶ 50, Dkt. # 23-3.)

72. After considering the Hay Group Report, the Finnerty Report and their own research and experience, Class Counsel concluded that, given the serious risk of a future Ford default on retiree health obligations, Class Members would be well served if the settlement resulted in their securing enough funding immediately for the New VEBA to provide for substantial lifetime health care benefits, even if future reductions in benefit levels may become necessary. Class Counsel determined that such a settlement would be preferable to bearing the continued risk of a default in which Class Members could receive little or nothing.

### K.  Class Counsel's Conclusion that the 2008 Settlement
### Is Fair, Reasonable and Adequate

73.     Based on Class Counsel's professional experience and judgment, Class
Counsel concluded that the possibility that the New VEBA may not have all the funding
needed to provide the retiree health benefits at the anticipated levels must be viewed in
light of the particular risks inherent in this litigation (*e.g.*, possible Ford bankruptcy,
chances of losing on the merits) as well as the risks inherent in all class action litigation.
(Payne Decl. at ¶ 51, Dkt. # 23-3.)

74.     Class Counsel reached those conclusions based upon analyses of the
contract provisions and the laws applicable to the claims alleged in the Complaint, the
burdens and expense of litigation, including the risks and uncertainties associated with
protracted trials and appeals, the risks and uncertainties arising from Ford's financial
condition, and the certainty and cost-efficiencies provided by the payments  set forth in
the 2008 Settlement Agreement.  (*Id.* at ¶ 52.)

75.     Class Representatives and Class Counsel all concluded that the proposed
settlement is fair, reasonable, adequate and in the best interests of the Class.  (*Id.* at ¶
53.)  They joined in the negotiation of the final settlement agreement, filed a motion for
class certification, and joined with Ford and the UAW in a motion for preliminary
approval of the proposed settlement.

### L.  Key Terms of the 2008 Settlement

### (1)  The EBA, Committee and the New Plan

76.     The 2008 Settlement Agreement provides for an Employees Beneficiary
Association ("EBA"), acting through an independent Committee ("Committee"), to
establish and maintain a new retiree welfare benefit plan (referred to herein as "the New

Plan") for the purpose of providing retiree health benefits to the Class and to a covered group of individuals, including current active employees as of November 19, 2007 who themselves are not members of the Class but are entitled to benefits by reason of retirement (or death) *after* November 19, 2007 (discussed below), as set forth in the Settlement Agreement. (Settlement Agreement § 4.B, Dkt. # 19-3.)

77. The Committee will consist of eleven (11) members: five (5) appointed by the UAW (and not affiliated with Ford), and six (6) independent "public members" initially approved by the Court. (*Id.* at § 4.A.) Subject to ERISA, the New Plan and New VEBA shall be administered by the Committee. (*Id.* at § 4.)

78. The parties intend that the Settlement Agreement supersedes and replaces the *Hardwick I* Settlement Agreement in its entirety. (Settlement Agreement at 1, Dkt. # 19-3.) Ford will continue to provide retiree health care benefits for Class Members at the same levels and scope as agreed to in the *Hardwick I* Settlement Agreement and as set forth in a new VEBA Trust Agreement ("Trust Agreement") until the latest of the dates when: (1) Ford has completed its accounting discussion with the staff of the SEC in a manner reasonably satisfactory to Ford, (2) all legal challenges and appeals regarding the proposed *Hardwick II* Settlement Agreement have been resolved or exhausted or (3) December 31, 2009. (*Id.* at §§ 5.A, 21.) [3] Benefits thereafter will be provided under the New Plan to be funded by a separate account of the New VEBA.

_____

[3]The Settlement Agreement and its final effective date are contingent upon Ford "securing the appropriate accounting treatment regarding Ford's obligations to the Class and the Covered Group for Retiree Medical Benefits." (2008 Settlement Agreement at § 21, Dkt. # 19-3.)

(*Id.* at § 5.B.)  The level of those benefits, however, will remain the same as they currently are under the *Hardwick I* Settlement Agreement until December 31, 2011. (*Id.*)

79.     On and after January 1, 2012, the Committee will have sole responsibility to determine the scope and level of benefits and may raise or lower the level of post-retirement medical benefits available to Class Members and the Covered Group, in its discretion and based on financial, actuarial, clinical and/or efficiency considerations, with a long-term objective, absent countervailing circumstances, to provide substantial health benefits for the duration of the lives of all participants and beneficiaries in the New Plan.  (*Id.;* (Form of) Trust Agreement at ¶ 10.2(a)-(b), Dkt. # 48-3.)

## (2)  The New VEBA

80.     After the Implementation Date (as defined below), a separate account in the New VEBA maintained, among other purposes, to account for the assets held in the New VEBA to fund the New Plan will be the exclusive source of funds to pay for retiree medical benefits for Class Members.  This separate account of the New VEBA also will fund retiree medical benefits, on the same basis as Class Members, for individuals who are not members of the Class but rather are entitled to benefits by reason of an active or former employee's retirement (or death) after November 19, 2007.  This latter group, termed the "Covered Group" includes:

> (i)     all Ford Active Employees who had attained seniority as of November 19, 2007, and who retire after November 19, 2007, under the Ford-UAW National Agreements, or any other agreement(s) between Ford and the UAW, and who upon retirement are eligible for Retiree Medical Benefits under the Ford Retiree Health Plan utilizing the eligibility provisions applicable to UAW represented employees or the

New Plan, as applicable, and their eligible spouses, surviving spouses and dependents;

(ii)     all former Ford-UAW Represented Employees and all UAW-represented hourly employees who, as of November 19, 2007, remained employed in a previously sold, closed, divested, or spun-off Ford business unit, and upon retirement are eligible for Retiree Medical Benefits from Ford and/or the Ford Retiree Health Plan or the New Plan by virtue of any other agreement(s) between Ford and the UAW, and their eligible spouses, surviving spouses and dependents; and

(iii)    all eligible surviving spouses and dependents of a Ford Active Employee, or of a former Ford-UAW Represented Employee or UAW-represented employee identified in (ii) above, who attained seniority on or prior to November 19, 2007, and die after November 19, 2007, but prior to retirement under circumstances where such employee's surviving spouse and/or dependents are eligible for Retiree Medical Benefits from Ford and/or the Ford Retiree Health Plan or the New Plan.

(2008 Settlement Agreement at §§ 1-2, Dkt. # 19-3.)

### (3) Funding of the New VEBA

81.     Contingent on judicial approval of the 2008 Settlement Agreement, Ford has agreed to contribute assets to the New VEBA that (including assets to be transferred from the existing *Hardwick I* VEBA) are now worth an estimated $13.299 to $14.965 billion (based on present value as of January 1, 2008). (Individual Class Notice, Ex. A., Dkt. # 44-7.) Ford's contributions will include cash payments, a term note and a convertible note, and will be made shortly after the Implementation Date, *i.e.* the date all appeals are exhausted and Ford has satisfactorily completed discussions about accounting treatment with the SEC (*see id.* at § 21) or, if later, December 31, 2009.

82.     Prior to the Implementation Date, Ford has agreed to directly or indirectly hold certain assets in a Temporary Asset Account ("TAA"), which serves as tangible evidence of the availability of Ford assets equal to the sum of certain amounts that Ford agrees to pay to the New VEBA.  The assets of the TAA, and their investment,  remain subject to Ford's exclusive control.  Ford has also agreed to issue the convertible note and term note to a wholly-owned limited liability company formed for the purpose of holding the notes and, in Ford's sole discretion, the TAA, and for the purpose of receiving interest or other income from such assets, until those assets, or cash or other assets in lieu of some or all of these assets, are transferred to the New VEBA following the Implementation Date.  (*Id.* at §§ 7, 12.)

83.     Ford's funding obligations with respect to the New Plan and the New VEBA are capped and fixed in accordance with the terms of the proposed 2008 Settlement Agreement.  (Settlement Agreement at §§ 5.B, 8, Dkt. # 19-3.)  In addition, Ford is not responsible for and does not guarantee (a) the level or scope of retiree medical benefits to Class Members under the New Plan, (b) the asset returns on the funds in the Existing Internal VEBA, the Existing External VEBA, the Temporary Asset Account, the limited liability company, or the New VEBA or (c) whether there will be sufficient assets in the separate account of the New VEBA to fund the current scope and level of retiree health benefits to be provided to the Class and the Covered Group indefinitely.  (*Id.* at §§ 5-6, 7.E; *see also id.* at 2.)

84.     The current level of retiree medical benefits, which previously was considered and approved by the court in the *Hardwick I* case, will be continued under the 2008 Settlement Agreement through at least December 31, 2011.  Ford will be

responsible for providing these benefits prior to and on the Implementation Date. Following the Implementation Date, these benefits will be provided under the New Plan. This level of benefits is comprehensive, providing a range of benefits for retirees that substantially exceeds the benefits generally available to most other retirees with employer-sponsored retiree health care plans, and at a cost that is substantially less than the cost most other retirees pay.  (Decl. of Phyllis Borzi at ¶¶ 13-21, Dkt. # 44-6 ("Borzi Decl.").)

85.    The 2008 Settlement Agreement mandates that the Committee solely will be responsible for establishing the scope and level of post-retirement medical benefits available to Class Members and the Covered Group as of January 1, 2012, and will have the discretion to raise or lower the level of such benefits with the long-term objective of providing meaningful health benefits to all participants and beneficiaries in the New Plan.  (Settlement Agreement at § 5.B, Dkt. # 19-3; (Form of) Trust Agreement at ¶ 10.2(a), Dkt. # 48-3.)  In exercising its authority over benefit design, the Committee shall be guided by the principle that the New Plan should provide substantial health benefits for the duration of the lives of all participants and beneficiaries.  ((Form of ) Trust Agreement at ¶¶ 10.2 (b)., Dkt. # 48-3.)

86.    Under the 2008 Settlement Agreement, Ford's obligations are fixed and capped.  However, the 2008 Settlement Agreement permits the UAW to negotiate additional contributions to the New VEBA by active employees from amounts that otherwise would have been payable as profit sharing, COLA, wages and/or signing bonuses to active Ford-UAW hourly employees.  (*Id.* at § 14.)

87.    Finally, other than the terms contained within the 2008 Settlement

Agreement, there are no agreements that were "made in connection with the proposal,"

Federal Rule of Civil Procedure 23(e)(3), other than an arrangement between the

parties and the United States Department of Labor as described in the joint filings of the

UAW and Class in support of final approval of the 2008 Settlement Agreement.

### M.  The 2008 Settlement Is Vital to Ford's Turnaround Plan

88.    In entering into the 2008 Settlement, Ford determined that a final

negotiated resolution of the parties' dispute and Ford's retiree health care obligation is

critical to its turnaround plan and the long-term success and profitability of its business.

(Daniel Decl. at ¶ 13,. Dkt. # 44-3.)  In particular, the 2008 Settlement resolves, once

and for all, the parties' ongoing dispute over retiree health care and provides a full,

complete and permanent resolution of all claims among the parties regarding retiree

health care benefits.  (Settlement Agreement at 1, Dkt. # 19-3; Daniel Decl. at ¶ 13.,

Dkt. # 44-3.)  The 2008 Settlement eliminates the inherent risks, uncertainty, and

expense of continued and prolonged litigation between the parties.

89.    The 2008 Settlement Agreement will substantially improve Ford's

opportunity for success by converting Ford's OPEB health care obligation attributable to

hourly retiree health care from an uncertain defined benefit plan to one that is fixed and

capped, and it should result in Ford being evaluated for credit purposes upon its

operational merit and more stable criteria.  (Benson Decl. at ¶ 10, Dkt. # 44-4.)  In

addition, by establishing an independent trust that will provide and be solely responsible

for hourly retiree health care, the 2008 Settlement will free up capital for Ford to invest

in its core business and new product development.  (Daniel Decl. at ¶ 11, Dkt. # 44-3.)

90.     The Settlement also will significantly limit Ford's exposure to unexpected short-term inflationary spikes in health costs at critical junctures that could frustrate the company's competitive initiatives.  (Benson Decl. at ¶ 8, Dkt. # 44-4.)

91.     The 2008 Settlement removes the substantial burden to Ford's business of administering retiree health care benefits, and provides the certainty of a cap and limit on Ford's obligation to pay for such benefits.  (Daniel Decl. at ¶ 13, Dkt. # 44-3.) This benefits Ford's business planning and, Ford anticipates that it will be viewed favorably by investors, lenders, and credit rating agencies.  (*Id.*)  Together with other aspects of Ford's turnaround plan, Ford predicts that the 2008 Settlement eventually will produce an upgrade in Ford's credit rating, giving Ford greater access to capital, improved cash flow, and investment flexibility, and will have a positive impact on Ford's stock value – all of which are essential to the company's long-term success.  (Benson Decl. at ¶ 10, Dkt. # 44-4.)

92.     Further, in addition to being critical to Ford's prospects for success and long-term financial stability, the 2008 Settlement maintains retiree medical benefits for the Class.  (*Id.* at ¶ 11.)  Under the 2008 Settlement, retiree medical benefits are maintained for the Class without any increase in participant contributions other than those provided for in the *Hardwick I* settlement for the entire period of the *Hardwick I* settlement.  (*Id.*; 2008 Settlement Agreement at § 5.A, B, Dkt. # 19-3.)  Moreover, after the New Plan and New VEBA assume responsibility for retiree medical benefits in 2010, it is expected that the Class and the Covered Group will have in excess of $13 billion in resources devoted to providing health care in retirement.  Those funds will be protected against Ford's claimed right to modify or eliminate retiree medical benefits, as well as

from financial distress that may make it impossible for Ford to continue to provide such benefits. (Benson Decl. at ¶ 11, Dkt. # 44-4.)

93. The parties reasonably concluded that, in the absence of a permanent negotiated resolution, Ford will continue to bear the significant competitive, fiscal and litigation challenges associated with its hourly retiree health care costs. Ford asserted that without the 2008 Settlement Agreement, Ford would be compelled to terminate the *Hardwick I* Settlement Agreement in 2011 and to take unilateral action to reduce retiree health care costs. (Daniel Decl. at ¶ 14, Dkt. # 44-3.) The UAW and the Class would oppose any such action, and the inevitable result would be prolonged and expensive litigation. While Ford believes that it would prevail in any such case, there is a risk that Ford might not. Moreover, even if Ford ultimately were successful in litigation, the delay in obtaining a final resolution of Ford's retiree health care obligation, which very likely would take several years, could thwart the company's ability to address its financial difficulties, further eroding the confidence of creditors, investors, Ford shareholders, financial and credit markets, car buyers and the press. (*Id.*) The parties concluded that the 2008 Settlement avoids these problems by addressing a significant obstacle to Ford's turn-around.

### N. The Class Notice

94. Following the filing of the parties' Joint Motion for Preliminary Approval of the 2008 Settlement Agreement on May 15, 2008, Ford provided notice to the class by mailing Class Notice packets via First Class Mail to the 115,953 households containing Class Members totaling over 187,000 people. (Decl. of Jose Fraga at ¶¶ 4-7, Dkt. # 44-7 ("Frega Decl.)".) It also provided notice by publication in the May 4, 2008, weekend

edition of the *Detroit News & Free Press* and the May 14, 2008, edition of *USA Today*. (Decl. of Audrey Moog at ¶ 3, Exs. A-B, Dkt. # 45 ("Moog Decl.").)  Notice was also provided to the federal and state attorneys general in compliance with the Class Action Fairness Act ("CAFA").  (Fraga Decl. at ¶¶ 4, 10-11, Ex. B, Dkt. # 44-7.)

95.     The Class Notice informed Class Members that they could object to the 2008 Settlement Agreement and, for those Class Members who also are members of the *Hardwick I* class, that they could object to the "Joint Motion for Relief from Judgment" to be filed in the *Hardwick I* case.  (Class Notice at ¶¶ 1-2, 9, 12-13, Dkt. # 21-3; Publication Class Notice, Dkt. # 21-4.)

96.     Each notice described the terms of the 2008 Settlement Agreement, informed Class Members of their right to object and the date of the fairness hearing, and (in the case of mailed notice) included a copy of the entire 2008 Settlement Agreement with exhibits (excluding Exhibit B ("Convertible Note") and Exhibit F ("Registration Rights Agreement"), which were deemed too large and impractical for direct mail delivery but were made available to class members upon request or via the internet). (Fraga Decl. at ¶ 4, Ex. A, Dkt. # 44-7; Moog Decl. at Exs. A-B, Dkt. # 45.)

97.     The Class Notice further informed Class Members that a complete copy of the 2008 Settlement Agreement, including all exhibits thereto, (1) was available on the Internet, (2) could be obtained by calling (800) 746-2107 and (3) could be inspected during business hours in the Office of the Clerk of the Court, as well as at Class Counsel and the UAW's offices.  (Fraga Decl. at Ex. A Dkt. # 44-7, Class Notice at ¶ 17; Moog Decl. at Exs. A-B, Dkt. # 45; Publication Class Notice, Dkt. # 21-4.)

98.     The Class Notice mailing was performed using the master list maintained by Ford's National Employee Service Center, which is the record keeper for Ford's employee benefit plans, including Ford's Hospital-Surgical-Medical-Drug-Dental-Vision Expense Coverage program covering hourly retirees, spouses, dependents and surviving spouses.  (Decl. of Dawn Kovoch-Howarth at ¶ 4, Dkt. # 45-2; Moog Decl. at ¶ 4, Dkt. # 45; Fraga Decl. at ¶¶ 4-6, Dkt. # 44-7.)  The Garden City Group, Inc. ("GCG"), a nationally prominent settlement administration company, was retained by Ford to implement and manage the mailing of Class Notice packets to Class Members.  (Fraga Decl. at ¶¶ 3-4, Dkt. # 44-7.)  In addition to the mailing, and in order to assist Class Members, GCG established a toll-free Helpline (1-800-746-2107) so that callers could speak with a live operator if they had questions or concerns or could request that a Class Notice packet be mailed to them.  (*Id.* at ¶ 7.)

### O.  Objections

99.     Neither the Attorney General of the United States, nor the Attorney General of any state, has filed any objection to the 2008 Settlement Agreement in response to the CAFA notices sent to them.   (*Id.* at ¶¶ 10-12.)

100.    Only nine (9) Class Members out of more than 187,000 have filed objections.  Of these, three (3) Class Members objected only to the 2008  Settlement Agreement, five (5) Class Members objected to both the 2008 Settlement Agreement and the *Hardwick I* Motion for Relief from Judgment and one (1) objector did not identify whether he was objecting to either or both.

### P.  Fairness Hearing

101.    The Court held a Fairness Hearing on July 10, 2008.  Only one Class

Member presented an objection at the Hearing. This individual asked that the Court amend specific terms of the 2008 Settlement Agreement.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

1.      The Court has jurisdiction in this action under Section 301 of the LMRA, 29 U.S.C. § 185, and Sections 502(e)(1) and (f) of ERISA, 29 U.S.C. §§ 1132(e)(1) and (f).

### B. Class Certification

2.      To be certified, the proposed class must meet the requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy) and one of the three options in Rule 23(b). *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156, 161 (1982). Based on the record after the fairness hearing, the court concludes that those requirements are met.

3.      **Numerosity**. There are approximately 187,000 individuals in the plaintiff class, amply satisfying the Rule 23(a)(1) requirement that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see UAW v. General Motors Corp.*, 497 F.3d 615, 625 (6th Cir. 2007) (class consisting of 476,676 retirees and dependents was "undoubtedly 'so numerous that joinder of all members is impracticable'" (referring to GM class size; citation omitted)) ("*Hardwick I* Appeal"); *see also, e.g., Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 884 n.1 (6th Cir. 1997) (objection to numerosity requirement in 1,000-member class was "frivolous").

4.      **Commonality**. The Rule 23(a)(2) requirement of commonality "'simply requires a common question of law or fact.'" *Reese v. CNH Am., LLC*, 227 F.R.D. 483,

487 (E.D. Mich. 2005) (quoting *Bittinger*, 123 F.3d at 884). "The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998).

5.      Whether Ford has a unilateral right to modify retiree benefits is a question of law common to the Class. In an Order entered April 28, 2008 (Dkt. # 30), the court concluded that there are common questions of law and fact, satisfying Federal Rule of Civil Procedure 23(a)(2), because members of the Class are covered by labor agreements and plan documents containing virtually identical provisions concerning Ford's obligations to provide retiree health care. Common questions include (1) whether Section 301 of the LMRA, 29 U.S.C. § 185(a), prohibits Ford from unilaterally reducing Class Members' health care benefits and (2) whether ERISA, 29 U.S.C. §§ 1132 (a)(1)(B) and (a)(3), also prohibits Ford from so doing. (Class Certification Order at 2, Dkt. # 30.) In addition, the Court ruled that Fed. R. Civ. P. 23(a)(3) is satisfied because the Class Representatives' claims are typical of the claims of the Class. (*Id.*); *see also* Bittinger, 123 F.3d at 879, 884 (finding commonality where retirees sought guaranteed lifetime, fully-funded benefits, even though a series of different CBAs governed those benefits); *Reese*, 227 F.R.D. at 487 (commonality established even though plaintiffs retired at different times and under different CBAs).

6.      **Typicality**. A "'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *In re Am. Med. Sys., Inc.*, 75

F.3d 1069, 1082 (6th Cir. 1996) (quoting 1 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 3:13 (4th ed. 2008)).  As with commonality, the typicality requirement is not an onerous one; so long as there is a strong similarity of legal theories, the requirement is met "even if substantial factual distinctions exist between the named and unnamed class members."  *Rankin v. Rots*, 220 F.R.D. 511, 518 (E.D. Mich. 2004).

7.     Here, Plaintiffs claim that Ford's planned unilateral modifications to retiree health care benefits would violate its obligations under ERISA and its contractual obligations under the collective bargaining agreements.  That claim, asserting a uniform obligation by Ford, satisfies typicality, notwithstanding any possible factual variations with respect to individual class members.  In addition, the Court ruled that Federal Rule of Civil Procedure 23(a)(3) is satisfied because the Class Representatives' claims are typical of the claims of the Class.  (Class Certification Order at 2, Dkt. # 30.)  Ford had announced its intention to unilaterally modify hourly retiree health care benefits, which, if implemented, would have affected Class Representatives and the Class in the same way.  (*Id.*); *see also* Bittinger, 123 F.3d at 884 (claim that defendant "originally planned to provide lifetime, fully-funded benefits to retirees" satisfies typicality).

8.     **Adequacy Of Class Representatives**.  The Sixth Circuit has identified two criteria for determining whether class representatives are adequate:  "1) [t]he representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute interests of the class through qualified counsel."  *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976).  Here, Class Representatives have the same common interest in protecting retiree health care benefits, and there is nothing to suggest that they would not

vigorously protect the interests of the Class. *See Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (stating that class members must "'possess the same interest and suffer the same injury'" to meet the Rule 23(a)(4) adequacy requirement) (citation omitted). Class Representatives have common interests with unnamed Class Members, as established by the fact that Rule 23(a)(2) commonality and Rule 23(a)(3) typicality are satisfied; further, nothing suggests that Class Representatives have interests conflicting with or antagonistic to the interests of the Class. (Order Granting Motion To Certify Class, Dkt. # 30.)

9. There are no potential intra-class conflicts that would jeopardize adequate representation or prevent class certification. In this regard, "it is well settled that only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Georgia State Conference of Branches of NAACP v. Georgia*, 99 F.R.D. 16, 34-35 (S.D. Ga. 1983) (citing 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1768 (2008) ("Fed. Prac. & Proc.")). Hence, mere "differences in the interests of the class representatives and the other class members are not dispositive under Rule 23(a)(4). The key question is whether the interests are antagonistic." *Steiner v. Equimark Corp.*, 96 F.R.D. 603, 610 (W.D. Pa. 1983) (emphasis in original); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-26 (5th Cir. 1999) ("Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests.").

10. In evaluating the adequacy of potential class counsel, Rule 23(g)(1)(l) requires that the Court consider (1) the work counsel has done in identifying or

investigating potential claims in the action, (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (3) counsel's knowledge of the applicable law and (4) the resources counsel will commit to representing the class.

11.     The Court specifically considered each of the four factors identified in Rule 23(g)(1)(C)(i) and concluded that they were satisfied.  (Order Granting Motion To Certify Class, Dkt. # 30.)  Class Counsel in this case are well qualified, more than adequate to the task and have the resources to commit to representing the Class.  Furthermore, Class Counsel have extensive knowledge of the law relating to retiree benefits litigation and they have years of experience litigating dozens of actions of this kind.  As set forth in footnote one of the Payne Declaration, some of these cases include *Armistead v. Vernitron Corp.*, 944 F.2d 1287 (6th Cir. 1991); *Asarco, Inc. v. United Steel Workers of Am.*, No. 03-CV-1297-PHX-FJM, 2005 U.S. Dist. LEXIS 20873 (D. Ariz. July 26, 2005); and *Bower v. Bunker Hill Co.*, 725 F.2d 1221 (9th Cir. 1984).  Thus, the court ruled that the Class Representatives would vigorously represent the interests of the Class through qualified counsel.  (Order Granting Motion To Certify Class, Dkt. # 30.)

12.     **Rule 23(b)(2).**  Finally, the Class may be certified under Rule 23(b)(2) in that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The requirements of this subsection are met when "the common claim is susceptible to a single proof and subject to a single injunctive remedy."  Senter, 532 F.2d at 525.  Courts routinely certify claims challenging an employer's modification of health care benefits

39

under Rule 23(b)(2), holding that, in such cases, the employer's alleged conduct is directed at the class as a whole and hence class-wide injunctive or declaratory relief is appropriate. *See e.g., Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993); *Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 665 (E.D. Mich. 1995) ("[I]t is abundantly clear that the . . . decision by [defendant] with regard to the then-existing health care benefits affected the entire proposed class, thus making the issue of a permanent injunction and corresponding declaratory relief facially appropriate."). Plaintiffs' claims in this case are all based on the contested question of whether Ford unilaterally may modify retirees' health care benefits – claims which are "susceptible to a single proof and subject to a single injunctive remedy," and hence are properly certified under Rule 23(b)(2). *Senter*, 532 F.2d at 525.

13.     Accordingly, the Court GRANTS final certification of the Class defined in Paragraph 12 of the Findings of Fact.

### C.  Final Approval of the Class Action Settlement

14.     The court evaluates the proposed settlement in light of the general federal policy favoring the settlement of class actions. *UAW v. General Motors Corp.*, No. 05-CV-73991-DT, 2006 WL 891151 at *12 (E.D. Mich. Mar. 31, 2006) (citing *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 803 F.2d 878, 880 (6th Cir. 1986)) ("*Henry I* Final Approval").

15.     Given this well-settled policy, "a district court's role in evaluating a private consensual agreement 'must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair,

reasonable and adequate to all concerned.'" *Henry I Final Approval* at *13 (citing *Clark Equip. Co.*, 803 F.2d at 880 (quoting *Officers for Justice v. Civil Serv. Comm'n of City & County of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982)).

16.     Because the very point of compromise is to avoid determining contested issues and to avoid the expense and uncertainty of litigation, the court should not "decide the merits of the case or resolve unsettled legal questions." *Id.* (citing Carson v. Am. Brands Inc., 450 U.S. 79, 88 n.14 (1981)).

17.     Nor should the court engage in the "'detailed and thorough investigation that it would undertake if it were actually trying the case.'" *Id.* at *14 (citing *Berry v. Sch. Dist.*, 184 F.R.D. 93, 98 (W.D. Mich. 1998)); 7B Wright, et al. Fed. Prac. & Proc. § 1797.5 ("The court may not try disputed issues in the case since the whole purpose behind a compromise is to avoid a trial.  Rather the judge is restricted to determining whether the terms proposed are fair and reasonable.")).

18.     In evaluating a proposed class settlement, the court "may limit the fairness hearing 'to whatever is necessary to aid it in reaching an informed, just and reasoned decision.'" *Henry I Final Approval* at *13 (citing *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 567 (6th Cir. 2001); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)).

19.     Courts have fashioned a series of factors to assist in weighing the potential risks and rewards inherent in going forward with litigation against the certainty of a compromise solution. *Henry I Final Approval* at *14.  Factors relevant to the court's evaluation are:

(1)     the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement;

41

(2)      the risks, expense, and delay of further litigation;

(3)      the judgment of experienced counsel who have competently evaluated the strength of their proofs;

(4)      the amount of discovery completed and the character of the evidence uncovered;

(5)      whether the settlement is fair to the unnamed class members;

(6)      objections raised by class members;

(7)      whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining; and

(8)      whether the settlement is consistent with the public interest.

*Henry I Final Approval* at *14 (citing *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 522 (E.D. Mich. 2003)); *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992).

20.     The court may choose to consider "only those factors that are actually relevant to the settlement at hand, and may weigh particular factors according to the demands of the case." *Henry I Final Approval* at *14 (citing *Granada Invs., Inc.*, 962 F.2d at 1205-06).

### D.  The Relevant Factors

### (2) The Likelihood of Success on the Merits

21.     A significant factor in the Court's evaluation of a proposed settlement is "the likelihood of success on the merits weighed against the relief offered in the settlement." *Henry I Final Approval* at *14 (citing *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984)).

22.    Although this factor requires "'some evaluation of the merits of the dispute,

the district court must refrain from reaching conclusions upon issues which have not

been fully litigated.'" *Id.* at *15 (citing *Berry*, 184 F.R.D. at 98).  The ultimate question,

rather, is "'whether the interests of the class as a whole are better served if the litigation

is resolved by the settlement rather than pursued.'" *Id.* (quoting *In re Cardizem*, 218

F.R.D. at 522).

23.    As the Court explained in *Hardwick I*:

> The legal issue presented in this case is whether plaintiffs' retiree
> health benefits are vested.  The parties vigorously dispute this
> issue, with class representatives and UAW on one side and Ford
> on the other side, asserting that governing Sixth Circuit law
> supports their respective positions.  *See, e.g., Yolton v. El Paso
> Tenn. Pipeline Co.*, 435 F.3d 571, 572 (6th Cir. 2006) ,cert. denied,
> 127 S. Ct. 555 (2006).
>
> The parties make various legal and factual arguments in support of
> their positions, demonstrating the strongly contested nature of their
> dispute.  The Court need not, and should not, resolve that dispute.
> *See Clark Equip. Co.*, 803 F.2d at 880.  The relevant question is
> whether the parties have been able to assess their respective
> positions and make an informed and appropriate determination
> about the relative merits and risks of settlement. The parties' briefs
> and argument make clear that they have analyzed the relevant plan
> documents, understand the governing law, and have thoroughly
> evaluated the respective arguments on the merits.
>
> Of equal importance, the parties recognize that, whatever the
> strengths of their positions, continued litigation involves substantial
> risks to each side. The parties acknowledge the inherent risks of
> litigation and the potentially catastrophic consequences for the
> retirees should the Court hold that their benefits are not vested.  In
> that case, Ford would be able to institute changes in retiree health
> benefits significantly more costly to retirees or terminate the
> benefits altogether.  Class representatives and the UAW
> reasonably concluded that even if their risk of losing was small, the
> consequence of a loss would be potentially calamitous for the UAW
> and the class.  For the class, even a slight risk of substantially
> higher costs is well averted.  *UAW*, 2006 WL 891151, at *16.  Thus,
> "[t]he fact that the plaintiff might have received more if the case had

been fully litigated is no reason not to approve the settlement."
*Priddy v. Edelman*, 883 F.2d 438, 447 (6th Cir. 1989).

*Hardwick I*, 2006 WL 1984363, at *22.

24.    In its ruling affirming this court's final approval of the settlement in

*Hardwick I* and *Henry I*, the Sixth Circuit summarized the parties' competing arguments

on the vesting question as follows:

> The retirees and the UAW point to the Yard-Man line of cases as
> support for their position that the retirees' healthcare benefits
> vested upon retirement.  *See Int'l Union, UAW of Am. v. Yard-Man,*
> *Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983) (holding that there was
> "sufficient evidence" of intent to vest retirees with benefits "in the
> language of [the] agreement itself"); see also *Int'l Union, UAW of*
> *Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 773-74 (6th Cir. 1999);
> *Smith v. ABS Indus., Inc.*, 890 F.2d 841, 846 (6th Cir. 1989).
> Consistent with these cases, they argue, both collective bargaining
> agreements contain the requisite vesting language:  "The health
> care coverages an employee has at the time of retirement . . . shall
> be continued."  GM JA 785.
>
> GM and Ford invoke the *Sprague* line of cases-to the effect that "an
> employer's commitment to vest" must be stated "in clear and
> express language" in the plan documents.  *Sprague v. Gen. Motors*
> *Corp.*, 133 F.3d 388, 400 (6th Cir. 1998) (en banc) (internal
> quotation marks omitted). Consistent with these cases, they argue,
> a reservation of rights to modify retiree healthcare benefits is
> inconsistent with the claim that those benefits have irreversibly
> vested, *see Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 919 (6th Cir.
> 2000), and note that the two companies' retiree healthcare plans
> contain such a reservation, see GM JA 550 ("Any rate of payment
> by the enrollee and any other terms and conditions of the Program
> may be changed at any time by the Corporation.").

*Hardwick I* Appeal, 497 F.3d at 631(some citations omitted).

25.    In sum, the court's task "is not to decide whether one side is right or even

whether one side has the better of these arguments."  *Id.* at 632.  Otherwise, the court

would "be compelled to defeat the purpose of a settlement in order to approve a

settlement."  *Id.*  Rather, the question is "whether the parties are using settlement to

44

resolve a legitimate legal and factual disagreement." *Id.* That is indeed the case now,

as it was in *Hardwick I*.

26.     Plaintiffs have concluded that risk of loss, even if unlikely, would produce

consequences so grave that they are worth avoiding through a settlement that

continues comprehensive health care benefits for the Class.[4]  *See Enter. Energy Corp.*

---

[4]As the Sixth Circuit concluded in *Henry I*:

> What makes these settlements particularly sensible, moreover, is
> that, even if this merits question favored one party over the other,
> the retirees still would have had ample reason to control the
> resolution of this dispute through negotiation today rather than
> litigation tomorrow.  If we decided for the sake of argument that the
> retirees were likely to lose the *Yard-Man/Sprague* debate, little
> would stand in the way of the car companies' reducing or even
> eliminating the retirees' healthcare benefits in the future.  If we
> decided for the sake of argument that the retirees were likely to win
> the debate, any such victory would run the risk of being a Pyrrhic
> one because the cost of insisting on irreversible healthcare benefits
> might well be – and indeed almost certainly would be – the
> continuing downward spiral of the companies' financial position.  If
> GM's automotive divisions lost $11.4 billion in 2005 while spending
> $3.7 billion to pay retiree healthcare benefits (and Ford's division
> lost $3.9 billion while spending $2.4 billion on retirees), it takes little
> imagination to picture the future financial toll this burden would
> place on the two companies.  While we need not embellish the
> point by raising the prospect of bankruptcy, it is well to remember
> that the Federal Government's Pension Benefit Guaranty
> Corporation, which provides *pension* guarantees for the employees
> and retirees of financially distressed companies, has no sister
> agency that provides the same guarantees for retiree *healthcare*
> benefits.
>
> In view of the risks the retirees faced from losing *and* winning the
> *Yard-Man/Sprague* debate, it is no wonder that Payne
> recommended settlement to the class representatives; no wonder
> that the named representatives consented to each settlement; no
> wonder that less than one half of one percent of class members
> objected to either settlement, . . . ; and no wonder that both district
> courts thought that the settlement was a fair way of handling the
> risks of litigation, *see* GM JA 140 ("[C]ost increases entailed by the

*v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 246 (S.D. Ohio 1991) ("'Class

counsel and the class representatives may compromise their demand for relief in order

to obtain substantial assured relief for the plaintiffs' class.'") (citation omitted); *Priddy v.*

*Edelman*, 883 F.2d 438, 447 (6th Cir. 1989) ("The fact that the plaintiff might have

received more if the case had been fully litigated is no reason not to approve the

settlement.") (citation omitted).

27.     The central legal issue in this proceeding is the same as it was in

*Hardwick I* and *Henry I*.  Under the ruling of the Sixth Circuit, this court's task

emphatically is not to decide the merits, *i.e.*, whether Class Members' retiree health

benefits are vested.  *See Hardwick I* Appeal, 497 F.3d at 631.  Rather, the salient point

is that here, as before, even if the merits favored one party or another, the settlement

still should be approved.  *Id.* at 632.

28.     The court has given careful consideration to the report of Adam Reese, in

accordance with the urging of the United States Department of Labor that the parties

reported in their memoranda supporting the motion for final approval.  His report states

_____

> settlement are modest . . . [and] [t]he potential loss of *all* benefits,
> due to either GM's financial collapse or GM's prevailing on the
> merits, would be far more harsh for Class Members.").  . . . And in
> view of the other factors we must consider-the federal policy
> favoring settlement of class actions, *In re Warfarin Sodium Antitrust*
> *Litigation*, 391 F.3d 516, 535 (3d Cir. 2004), the signal importance
> of GM and Ford to the economies of Michigan and the country, . . .
> and the extensive information-sharing between the companies, the
> UAW, the class representatives and even McKnight and Bronson
> that preceded the settlements, . . . it is no wonder that both district
> courts approved the final settlements as "fair, reasonable, and
> adequate" under Rule 23(e)(1)(C).  . . . We see it the same way.

> *Id.* at 632-33 (some citations omitted) (emphases in original).

that under certain plausible conditions, the New VEBA would be expected to continue providing benefits at the current levels for as long as Class Members are alive to receive them. His report also projects that under other plausible conditions, the VEBA Committee would have to reduce benefits at some point in the future in order to continue providing substantial benefits for as long as they will be needed. If benefit reductions of any magnitude prove to be necessary in the future, those reductions would undoubtedly create some hardship for Class members, and the court is sensitive to that hardship. But the status quo threatens even greater potential future hardship. The court concluded that in the absence of the settlement, the class faces greater risks of future benefit reductions or even termination of those benefits. Under these circumstances, the settlement is fair, reasonable and adequate for the class.

29.     Courts routinely recognize that settlements never equal the full value of the loss claimed by the plaintiffs. *See Henry I* Final Approval at *23. "In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* (citing *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 445 n2 (2d Cir. 1974)).

30.     Moreover, "[a] just result is often no more than an arbitrary point between competing notions of reasonableness." *Henry I* Final Approval, at *17 (quoting from *In re Corrugated Container Antitrust Litig. (II)*, 659 F.2d 1322, 1325 (5th Cir. 1981)). Thus, "[i]n assessing the settlement, the Court must determine 'whether it falls within the "range of reasonableness,' not whether it is the most favorable possible result in the litigation.'" *Henry I* Final Approval at *17 (citation omitted).

31.     Here, the court concludes that the proposed Settlement falls well within this range of reasonableness, and that the benefits to the Class from the Settlement are substantial.

### (2) The Risks, Expense, and Delay of Further Litigation

32.     Complex litigation of the sort involved in this case is costly and time-consuming, as demonstrated by previous cases in this circuit involving modifications to retiree benefits.  *Henry I* Final Approval at *17.  For example, as discussed in *Henry I*, GM salaried workers and retirees commenced litigation in 1989 challenging the modification of their health care benefits.  *Id.*  That case was resolved nine years later, after a trial and hearing (and rehearing) in the Sixth Circuit.  *See Sprague*, 133 F.3d 388.  Similarly, seven years of litigation were required for the parties in *Yard-Man* to have finality.  *Yard-Man*, 716 F.2d at 1482.  The obvious costs and uncertainty of such lengthy and complex litigation weigh in favor of settlement.  *See In re Cincinnati Policing*, 209 F.R.D. 395, 400 (S.D. Ohio 2002) ("[T]he Court has no doubt that the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. . . . The prospect of such a massive undertaking clearly counsels in favor of settlement.") (internal quotation marks and citations omitted).

33.     Similarly, given Ford's current financial struggle, the delay necessary to litigate the dispute would benefit no one.  *See Henry I* Final Approval at *18.  For Ford, success at litigation may come too late to effect the turnaround that is essential to Ford's continued viability.  *Id.*  For the Class, the parties recognize that absent this

settlement, Ford may be unable to continue to provide retiree health care benefits to the Class.

34.     In short, success at litigation (for either side) may prove illusory, a prospect that makes settlement a reasonable course.  *Henry I* Final Approval at *18 (citing *In re Rio Hair Naturalizer Prods. Liab. Litig.*, No. MDL 1055, 1996 WL 780512, at *13 (E.D. Mich. Dec. 20, 1996) ("[A] victory by Plaintiffs at trial, given Defendants' limited funds, would be pyrrhic.")).

### (3)  The Judgment of Experienced Counsel Who Have Competently Evaluated the Strength of their Proofs

35.     Class Counsel here fully support the proposed settlement.  The endorsement of the parties' counsel is entitled to significant weight, and supports the fairness of the class settlement.  *Henry I* Final Approval at *18.  It is "'well recognized that the court should defer to the judgment of experienced counsel who has competently evaluated the strength of the proofs."  *Id.* (quoting *Mich. Hosp. Ass'n v. Babcock*, No. 5:89-CV-00070, 1991 U.S. Dist. LEXIS 2058, at *6 (W.D. Mich. Feb. 11, 1991) and citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).

36.     Where, as here, counsel are reputable practitioners and experienced in complex class action litigation, their collective judgment in favor of the settlement is entitled to considerable weight.  *Henry I* Final Approval at *19 (citing *Ass'n for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("[T]he Court must rely upon the judgment of experienced counsel and, absent fraud, 'should be hesitant to substitute its own judgment for that of counsel.'")).

## (4)  The Amount of Discovery Completed
## and the Nature of the Evidence Uncovered

37.    In considering whether there has been sufficient discovery to permit the plaintiffs to make an informed evaluation of the merits of a possible settlement, the court should take account not only of court-refereed discovery but also informal discovery in which parties engaged both before and after litigation commenced.  *Henry I* Final Approval at *19 (citing *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 557 (S.D. Ohio 2000) (although little formal discovery was conducted, class counsel retained experts and conducted informal discovery before negotiating the settlement agreement)).

38.    Thus, the absence of formal discovery is not unusual or problematic, so long as the parties and the court have adequate information in order to evaluate the relative positions of the parties.  *Henry I* Final Approval, at *19 (citing *Newby v. Enron Corp.*, 394 F.3d 296, 306 (5th Cir. 2004) ("'[F]ormal discovery [is not] a necessary ticket to the bargaining table.'")).

39.    The court need not possess sufficient "evidence to decide the merits of the issue, because the compromise is proposed in order to avoid further litigation."  *Henry I* Final Approval, at *19 (citing 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:45 (4th ed. 2008); In re Rio Hair Naturalizer, 1996 WL 780512, at *13)). Instead, the district judge need only have "'sufficient facts before him to intelligently approve or disapprove the settlement.'"  *Henry I* Final Approval at *19 (citation omitted).

40.    The evidence demonstrates that there was full disclosure in this case by Ford to the Class and the UAW of Ford's business and financial condition, including Ford's health care liability, and the relevant CBAs and health care plan documents.

Both the UAW and Class Counsel, assisted by their respective experts, undertook independent analyses of Ford's financial condition and legal position. There was significant information available to the parties to negotiate their compromise, and there is more than an adequate basis and evidentiary record on which the court can assess the parties' agreement. *See Henry I* Final Approval at *19.

### (5) The 2008 Settlement is Fair to the Absent Class Members

41.     Courts may scrutinize settlements to determine whether absent Class Members have lost out in favor of attorneys and named Class Members. In this case, the Class is cohesive and the 2008 Settlement Agreement affects similarly-situated class members the same. (Br. in Supp. of Mot. for Class Certification at 15-17, Dkt. # 23.) No preference is granted to the Class Representatives under the 2008 Settlement and, because all class members have a unitary interest in seeking the best possible benefits for retirees, there is no risk of an undue burden on absent class members. (*Id.*); see, e.g., 6 James Wm. Moore et al., Moore's Federal Practice ¶ 23.164 (3d ed. 1999). Only nine (9) out of more than 187,000 Class Members (0.005 of one percent) have objected.

### (6) The Number of Objections Raised by Class Members Supports Approval of the 2008 Settlement

42.     "A court should not withhold approval of a settlement merely because some class members object." *Henry I* Final Approval at *20 (citations omitted). This is because even though the court must evaluate any objections, it "has an obligation to protect the interests of the silent class majority, despite vociferous opposition by a vocal minority to the settlement." *Henry I* Final Approval at *20 (citation omitted).

43.     In this case, Ford provided notice to the Class by First Class Mail and by publication.  The Notice was easily understood, it succinctly and accurately summarized the 2008 Settlement Agreement's terms and informed class members of their rights – including their right to object to the 2008  Settlement Agreement and (for those Class Members who also are members of the *Hardwick I* class) to the "Joint Motion for Relief from Judgment" in the *Hardwick I* case.  This notice was the best practicable under the circumstances and fully satisfied the requirements of Federal Rule of Civil Procedure 23.

44.     After receiving this notice, only nine (9) out of approximately 187,000 Class Members (less than .005%) submitted an objection to the 2008 Settlement Agreement.  This level of objection is considerably lower than even the level in Hardwick I, where less than one half of one percent of the Class Members submitted an objection.

45.     The court notes the proponents' argument that an overwhelming degree of silence on the part of other members of the class could indicate support for the 2008 Settlement, but finds that an inference to that effect is weak.  Silence could also variously indicate apathy, confusion, disorganization, literacy problems, timidity or a number of other things.  The silence pointed out in this instance indicates to the court not so much the presence of approval, but the absence of opposition.  Such a substantial absence of opposition is, nonetheless, an indicator favoring approval of the 2008 Settlement.  *Robinson v. Ford Motor Co.*, No. 04-00844, 2005 WL 5253339 at *17 (S.D. Ohio June 15, 2005) ("[A] relatively small number of class members who object is

an indication of a settlement's fairness") (citing Newberg § 11.48). The specific content of the filed objections is discussed below.

### E. The 2008 Settlement was the Product of Arm's-Length Negotiations

46. Courts presume the absence of fraud or collusion unless there is evidence to the contrary. *Henry I* Final Approval, at *21 (citing *In re Rio Hair Naturalizer*, 1996 WL 780512, at *14 ("Courts respect the integrity of and presume good faith in the absence of fraud or collusion in settlement negotiations, unless someone offers evidence to the contrary.")). Here there have not even been any allegations of fraud or collusion.

47. To the contrary, there is an ongoing adversarial relationship between the Class and the UAW, on the one hand, and Ford, on the other, with respect to the question of Ford's asserted right to unilaterally change, modify or terminate health care benefits, and the parties are in fundamental and irreconcilable disagreement on this issue. Further, if the settlement agreement itself is fair, reasonable and adequate, then the court may assume that the negotiations were proper and free of collusion. *Henry I* Final Approval at *21 (citing *Bowling v. Pfizer, Inc.*, 143 F.R.D. 141, 152 (S.D. Ohio 1992) ("In essence, under this test, if the terms of the proposed settlement are fair, then the court may assume the negotiations were proper.")); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) ("It is, ultimately, in the settlement terms that the class representatives' judgment and the adequacy of their representation is either vindicated or found wanting.").

### F. The Public Interest

48. The evidence submitted by Ford amply catalogs the impact of Ford's continued viability on the economy of southeast Michigan, the State of Michigan as a whole and, indeed, the nation. The delay and risks of litigation have an impact not only on Ford, the UAW and the Class, but also on the families, businesses and communities that depend on Ford's continued competitiveness and viability. The court concludes that those interests are advanced by the 2008 Settlement Agreement. The Agreement also serves the public interest by conserving the resources of the parties and the court, and by promoting the "strong public interest in encouraging settlement of complex litigation and class action suits." *See Henry I* Final Approval at *22 (citing *In re Cardizem*, 218 F.R.D. at 530; *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323-24 (S.D. Fla. 2005) ("'[S]ettlement will alleviate the need for judicial exploration of these complex subjects, reduce litigation cost, and eliminate the significant risk that individual claimants might recover nothing.'") (citation omitted)).

### G. Objections to the Settlement

49. Of the nine (9) Class Member objections, five (5) asserted an objection both to the 2008 Settlement Agreement and to the Joint Motion for Relief from Judgment. The remaining three (3) objections related only to the 2008 Settlement. None of those objecting to the *Hardwick I* Joint Motion specifies or explains the basis for the objection to that motion. When the substance of the objections are considered, they do not provide a basis for disapproving the parties' settlement. As discussed below and as shown throughout the submissions of the Class, the UAW and Ford, the settlement is fair, reasonable and adequate. Accordingly, final approval is warranted.

**(1) Objection Asserting the General "Unfairness" of the 2008 Settlement**

50. One (1) objector objects generally that the settlement does not treat retirees fairly. As this court found in *Henry I*, "[b]ecause there is no way for the court to determine the basis for these objections or whether any such objections have merit, they are of little use." *Henry I* Final Approval, at *22 (citing *In re Rio Hair Naturalizer*, 1996 WL 780512, at *14 ("General objections without factual or legal substantiation carry little weight.") (quoting 4 Newberg on Class Actions § 11:58); see also 7B Wright, et al., Fed. Prac. & Proc. § 1797.1 ("Only clearly presented objections . . . will be considered.")).

51. Other objectors fail to present any relevant factual grounds for their objection. For example, one objector referred to a settled Workers Compensation case but provided no basis for evaluating his claim that the 2008 Settlement Agreement somehow contradicts it. This Objector failed to provide any writing showing that Ford agreed to provide him with benefits other than those it provides to other retirees. Without such evidence, there is no basis for the court to exclude this objector from the terms of the 2008 Settlement applicable to the Class as a whole. Further, workers compensation medical coverage is entirely separate from, and is unaffected by, the 2008 Settlement.

**(2) Objection that Benefits are Vested and/or that
Ford Told Employees Benefits Were for Life**

52. Several Class Members assert that benefits are vested and can never change. The court in *Hardwick I* reviewed and denied this same objection:

> With respect to the objection that modification of retiree benefits is a breach of contract or that the benefits are vested, these objections amount to a disagreement over the merits of the parties'

55

dispute and are not a basis for disapproving the Settlement. *Laskey v. Int'l Union, UAW*, 638 F.2d 954, 957 (6th Cir. 1981) ("the objections made indicated these employees did not want to compromise at all but wanted full benefits, rather than making any complaint directed to the adequacy of their legal representation").

2006 WL 1984363, at *27.

### (3)  Objection Based on Financial Hardship

53.    One (1) objector stated that he could not afford his benefits as it is; another complained that if a Ford executive "is worth that many millions to Ford I should be entitled to just as much."  This court in Henry I ruled as follows with regard to objections that similarly asserted "unfairness or individual hardship" or "otherwise t[ook] issue with particular features of the settlement":

> The court is mindful of the retirees' concerns and the hardships that cost increases may cause to certain individuals.  However, the parties have endeavored to design a plan that provides continued comprehensive coverage at a moderate cost that will be affordable to most, if not all, class members.  Moreover, the court cannot ignore that the alternative to settlement-the risks of continued litigation and GM's financial condition-will likely be worse for the retirees.

2006 WL 891151 at *35 (emphasis in original).

The court similarly ruled in *Hardwick I*:

> A number of objectors noted that they will experience hardship if the Settlement is approved.  However, much of the structure of the Settlement is aimed at mitigating the impact of premiums, deductibles, and the like on retirees and their families.  The Settlement also protects the most vulnerable class members by continuing their comprehensive health benefits without imposing co-payments, co-insurance, or annual deductibles.  Moreover, the Court cannot ignore that an unfavorable litigation outcome might result in even greater hardship to the risk of the class.

2006 WL 1984363 at *28.

### (4)  Other Objections

54.    One objector expressed concern regarding the composition of the New

VEBA Committee.  The Committee is entrusted with both a fiduciary responsibility and

the authority to manage assets and to adjust future benefits (after 2011) as necessary

for the purpose of providing meaningful lifetime benefits to the Class and the Covered

Group.  The independent Committee will include five UAW-selected members and six

independent "public" members initially approved by the court.  The independent

members are experts in fields that materially will aid them in exercising their fiduciary

responsibility on behalf of the retirees.  (*See* (Form of) Trust Agreement at ¶¶ 1.38, 9.1,

Dkt. # 48-3.)

55.    Any concerns about UAW involvement should be dispelled by the court's

ruling in *Hardwick I*:

> The UAW has a long and storied history of defending the interests
> of retirees-including particularly, retiree health care and other
> retiree benefits-both at the bargaining table and in the courtroom.
> For example, during the 1960s the UAW negotiated improvements
> in health care for already retired employees, with the result that a
> retiree who left Ford in 1958 under a collective bargaining
> agreement providing for no Ford contribution to retiree health
> became entitled by 1967 to Ford's payment of 100% of the
> premiums for himself and eligible dependents.
>
> In addition, the UAW has litigated or funded the litigation of
> numerous cases on behalf of UAW retirees to preserve retiree
> benefits.  The UAW has litigated these cases in trial and appellate
> courts, with active workers footing the legal bills through their union
> dues.
>
> UAW active members have historically proven their willingness to
> devote their bargaining leverage, their dues, and now their
> scheduled wage increases, to the cause of retiree health benefits
> for two reasons:  because active workers-about one-quarter of
> whom are facing imminent retirement themselves-recognize that
> they will benefit from the UAW's advocacy when it comes time for
> their own retirement, and because they believe it is simply the right
> thing to do.

2006 WL 1984363 at *7 (citations omitted).

55.     Another objector, who also presented his objection at the Final Fairness Hearing, asked that the court amend certain terms of the 2008 Settlement Agreement. Under Rule 23, however, the role of the district court is "limited to a determination of whether the terms proposed are fair and reasonable to those affected," *Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 305 (E.D. Mich. 1988), aff'd sub nom. *Priddy v. Edelman*, 993 F.2d 438 (6th Cir. 1989), and a district court has no power to alter the terms of a settlement agreement.

56.     These miscellaneous objections do not call into question the court's determination that the 2008 Settlement is fair, reasonable and adequate, and should be approved.

## CONCLUSION

The court concludes that the parties have achieved a negotiated resolution of a serious and exceedingly complicated problem. Counsel have worked long and hard, retained highly qualified experts, and given this matter the serious attention that it requires and deserves. Based on the expert analysis and disclosures, the court is well aware that there are real risks to the Class associated with the settlement that it finally approves today. However, like the parties, the court has evaluated these risks in light of the even greater risks of not settling this dispute.

For the reasons stated above, the court finds that the parties' 2008 Settlement Agreement is reasonable, fair and adequate, and the court APPROVES the 2008 Settlement Agreement in all respects and as to all parties.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: August 29, 2008

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 29, 2008, by electronic and/or ordinary mail.

s/Lisa G. Wagner
Case Manager and Deputy Clerk
(313) 234-5522