**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE, AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA et al.,

        Plaintiffs,

v.                              Case No. 07-CV-14845

FORD MOTOR COMPANY,          CLASS ACTION

        Defendant.

_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW APPROVING AMENDMENTS
TO THE 2008 SETTLEMENT AGREEMENT**

       The parties in this health care benefits class action have presented to the court a

proposed amendment of a previously approved settlement.  Members of the class had

the opportunity to submit written objections, as well as oral objections during an October

21, 2009 fairness hearing. After the hearing, the parties submitted joint proposed

findings of fact and conclusions of law in support of final approval of the amendments.

The court has thoroughly reviewed these proposed findings of fact and conclusions of

law.  The court will adopt them with some modification and reject all objections

inconsistent with these findings of fact and conclusions of law.

**I. FINDINGS OF FACT**

**A.  Introduction**

   1.  In August 2008, this court approved a class action settlement agreement among

Ford Motor Company ("Ford"), the International Union, United Automobile, Aerospace,

and Agricultural Implement Workers of America ("UAW"), and a class of Ford retirees

formerly represented by the UAW concerning retiree health benefits ("2008 Settlement Agreement"). *See* Dkt. # 52, Final Order and Judgment.

2.  In connection with the approval of the 2008 Settlement Agreement, the court issued detailed Findings of Fact and Conclusions of Law. *See* Dkt. # 51, Findings of Fact and Conclusions of Law. Those findings and conclusions provide the background for and basis of the 2008 Settlement Agreement and discuss the factual and legal grounds for the court's approval.

3.  Under the 2008 Settlement Agreement, responsibility for providing retiree health benefits will be transferred from Ford to a new employee welfare benefit plan established pursuant to the 2008 Settlement Agreement (the "New Plan"). *Id.* at 24-25. Retiree health benefits provided by the New Plan will be funded exclusively by a voluntary employees' beneficiary association (the "New VEBA"), from deposits and remittances made by Ford and the Existing External VEBA. *Id.* at 25, 27. Acting through the independent Committee consisting of eleven members – five appointed by UAW and six "Public Members" initially approved by the court – the New VEBA, which was established on October 16, 2008, will be the sole source of funds for the New Plan. *See id.* at 25-26. Under the 2008 Settlement Agreement, the Committee will have sole responsibility for defining retiree health benefits under the New Plan for Class Members and eligible future retirees (the "Covered Group"), subject to a restriction that benefit levels may not be modified until 2012. *Id.* at 26.

4.  The transfer of responsibility for providing retiree health benefits from Ford to the New Plan under the 2008 Settlement Agreement is scheduled to occur on January 1, 2010. *Id.* at 27. Until that time, Ford will continue to provide retiree health benefits for

Class Members at the same levels and scope as agreed to pursuant to the settlement agreement reached in the related action, *Int'l Union, UAW et al. v. Ford Motor Company*, No. 05-74730 ("*Hardwick I*"). *Id.* at 25; Dkt. # 63-6, *2008 Settlement Agreement* § 5.A. Thereafter, benefits will be provided under the New Plan and funded exclusively by the New VEBA. Dkt. # 63-6, *2008 Settlement Agreement* § 5.B.

5. On July 23, 2009, the parties moved for preliminary approval of proposed amendments to the 2008 Settlement Agreement, which are effected by the Amendment to Settlement Agreement between the parties (the "Amendment Agreement"). The proposed amendments chiefly affect the form and timing of Ford's deposits and remittances to the New VEBA. The overall purpose of the amendments is to smooth out Ford's payment obligations and permit Ford to make up to 50% of its payment obligations in Ford common stock of equivalent value based on the stock price, subject to protections that UAW and Class Counsel negotiated in order to protect the New VEBA from long-term equity risk arising from holding Ford common stock. In addition, the amendments give the Committee responsibility to determine benefit levels under the New Plan as of the day following the Implementation Date (as defined in the amended Settlement Agreement) when the liability for retiree medical benefits shifts to the New Plan and the New VEBA. The court granted preliminary approval of the proposed amendments on August 6, 2009. Dkt. # 66, Order Granting Preliminary Approval.

**B. The Proposed Amendments to the 2008 Settlement Agreement**

*Economic Conditions Leading to the Negotiation of the Proposed Amendments*

6. Just after the 2008 Settlement Agreement was approved in August 2008, the national and worldwide economies moved from a period of slowdown into a period of

crisis. The U.S. automotive industry has been deeply affected by the combined impact of the housing crisis, the credit crisis, fluctuating gas prices, and significant spikes in commodity prices. *See* Dkt. # 69-2, Shanks Decl. ¶ 4. Across the United States, auto sales declined heavily: During the last half of 2008, domestic light vehicle sales fell at a 45% annualized rate, the worst decline since 1980. *Id.* ¶ 7. By October 2008, the annualized sales rate for the United States automobile industry was only 10.5 million units, compared to 16 million units in 2007. *Id.* In a single year the U.S. auto industry lost over 5 million vehicle sales – the equivalent of two companies the size of Ford's North American division. *Id.* The impact of these events was evident in the industry's ensuing operational and financial performance.

7. In 2008, Ford experienced a negative change in Automotive gross cash of $21.2 billion and a total company net loss of $14.7 billion. *Id.* ¶ 9. Approximately $6 billion of that loss stemmed from the fourth quarter alone – the quarter that immediately followed this court's approval of the 2008 Settlement Agreement. *Id.* Ford's worldwide wholesale unit sales fell by almost 900,000 units (14%) compared to 2007. *Id.* ¶ 8. As a result, Ford's worldwide Automotive revenue decreased by $20 billion compared with 2007. *Id.*

8. In 2008 on a pre-tax basis, Ford's total ongoing Automotive operations lost $10.1 billion, and Ford North America had an operating loss of $10.2 billion. For the first half of 2009, Ford's total ongoing Automotive operations lost $3.5 billion, and Ford North America had an operating loss of $1.8 billion. *Id.* ¶ 10. The federal government's Car Allowance Rebate System ("Cash for Clunkers") program helped Ford experience a 17% increase in total sales in August 2009 compared to August 2008, but September

4

2009 sales results fell by 6% compared with September 2008.  *Id.* ¶ 11.  Ford presently

estimates that in 2009 the total annual Automotive sales volume in the United States will

be between 10.5 million and 11 million units, representing a steep decline from a total of

16 million units in 2007.  *Id.* ¶ 12.

9.    In response to these economic conditions, Ford has taken significant steps

aimed at reducing expenses, cutting excess capacity, and ultimately returning the

Company to profitability.  *Id.* ¶ 13.  Over the past three years, Ford has closed 17 plants

and reduced its number of employees by 12,000 salaried workers and 44,000 hourly

workers.  *Id.*  In 2008, Ford further reduced employment, cut compensation and benefits

at all levels, and eliminated merit raises and bonuses for North American salaried

employees – including top management – for 2009.  *Id.*

10.    To weather the economic crisis and, in time, return to profitability, Ford

also has taken steps to restructure its debt burden.  *Id.* ¶ 14.  In the first half of 2009,

Ford and its subsidiary, Ford Motor Credit Company, LLC ("Ford Credit"), used $2.6

billion in cash plus 468 million shares of Ford common stock to reduce Ford's

outstanding automotive debt by $10.1 billion from $25.8 billion at December 31, 2008.

*Id.*  This restructuring will reduce Ford's annual cash interest expense by more than

$500 million based on current interest rates.  *Id.*

11.    Ford also sought to renegotiate the form and timing of its payments to the

New VEBA under the 2008 Settlement Agreement.  Based on their own evaluation of

Ford's financial condition and the risks posed by the continuing economic crisis, the

UAW and Class Counsel agreed to engage in negotiations.

12.    In connection with the negotiations, UAW's consultant, Lazard Frères &

Co. LLC, performed a comprehensive evaluation of Ford's financial condition and business prospects.  Lazard's evaluation included consideration of macroeconomic factors, the potential for domestic auto sales to remain at depressed levels, competitive forces, the shift in consumer demand to fuel-efficient vehicles, Ford's developing product mix, the impact of limited cash flow over the near term, supplier relations, the impact of Ford's low credit rating and highly leveraged balance sheet on its borrowing capacity, and the performance of Ford Motor Credit Company, among other factors. Dkt. # 69-3, Yearley Decl. ¶¶ 12-15.

13.      Based on its evaluation, Lazard recommended that UAW explore a restructuring of Ford's payment obligations to the New VEBA, including taking a portion of the consideration in Ford common stock rather than cash, if Ford also successfully reduced other company debt.  *Id.* ¶ 18.  In Lazard's view, "[r]educing Ford's cash obligations to the [New] VEBA as part of a broader and comprehensive restructuring plan provided [Ford] the best chance to remain competitive in the long run and protect the interests of current and future retirees."  *Id.*

14.       During negotiations, UAW's goal was to ensure that the New VEBA would receive assets with a present value and cash flow duration consistent with the 2008 Settlement Agreement.  *Id.* ¶ 19.  It also conditioned any agreement to restructure the New VEBA payments on Ford obtaining similar concessions from other stakeholders.[1] After intense negotiations, UAW and Ford executed a Memorandum of Understanding ("MOU") on March 9, 2009, which was subsequently modified on June 23, 2009.  *Id.* ¶ 20.  Under the MOU (and carried over to the terms of the proposed amendments), the

---

[1]Chief among these was the debt restructuring Ford completed in April 2009, discussed above in Paragraph 10.

6

New VEBA will receive assets consistent with the 2008 Settlement Agreement.  *Id.*
¶ 21(a).  At the time the MOU was executed in March 2009, Lazard estimated the
January 1, 2010 value of Ford's payment obligations to the New VEBA under the 2008
Settlement Agreement to be $12.9 billion (reflecting a loss of value compared to
January 1, 2008 estimates due to poor investment performance, primarily affecting the
value of the assets of the Existing Internal VEBA and the Existing External VEBA
(established pursuant to the *Hardwick I* Settlement Agreement) that Ford is obligated to
transfer to the New VEBA).  *Id.*  Under the MOU and embodied in the proposed
amendments, Ford has agreed to make payments with an estimated value of $13.1
billion as of January 1, 2010.  *See id.*

15.    On behalf of the Class and the Class Representatives, Class Counsel
conducted their own evaluation of Ford's financial condition and the terms of the
proposed amendments.  *See* Dkt. # 62, Payne Decl. dated July 23, 2009 ¶¶ 15-17.
Class Counsel engaged their own financial expert, who advised them on Ford's financial
condition and the proposed amendments, and assisted with the drafting of the New
Notes, Warrants, Registration Rights Agreement and other settlement papers.  *Id.*
¶¶ 16-17.  Based on the advice of their expert and on their own professional experience
and judgment, Class Counsel concluded that the changes embodied in the proposed
amendments were warranted and were in the best interests of the Class.  *Id.* ¶¶ 17-18;
Dkt. # 69-4, Payne Decl. dated Oct. 16, 2009 ¶ 11.


*Aspects of the 2008 Settlement Agreement Affected by the Proposed
Amendments*

7

16.    The proposed amendments affect (1) the form and timing of Ford's payments to the New VEBA, and (2) the date on which the Committee assumes full discretion to modify retiree health benefits under the New Plan.

17.    Under the 2008 Settlement Agreement, Ford issued two notes: (i) a Convertible Note with a face value of $3.334 billion that bears interest at a rate of 5.75% per year payable semi-annually and that is convertible into Ford common stock at a conversion price of $9.20 per share, subject to adjustments, *see* Dkt. # 63-6, 2008 Settlement Agreement § 7.C.i & § 7.D.ii, and (ii) a Term Note with a face value of $3.0 billion that bears interest at a rate of 9.5% per year payable semi-annually and that is secured on a second-lien basis with collateral Ford pledged pursuant to its Credit Agreement dated December 15, 2006. *See id.* § 7.C.ii & § 7.D.iii. The Convertible Note is to mature on January 1, 2013; the Term Note is to mature on January 1, 2018, with a prior payment also due on January 1, 2017. *See id.* § 1 (defining "Convertible Note" and "Term Note").

18.    The 2008 Settlement Agreement also required Ford to hold assets in a Temporary Asset Account ("TAA") to serve as tangible evidence of the availability of assets equal to the sum of certain amounts that Ford has agreed to pay the New VEBA. *See id.* § 7.A). Ford deposited over $2.733 billion in January 2008, and also made a Base Amount payment (described below) and certain other interest payments in respect of the Convertible Note and the Term Note. Dkt. # 61, Mem. in Support of Jt. Mot. for Prelim. Approval at 6. Subsequently, Ford exchanged the assets in the TAA for a promissory note (the "TAA Note") in a principal amount equal to the market value of the

assets in the TAA as of the end of 2008. *Id.*; *see also* Dkt. # 63-14, TAA Note; Dkt. # 61-3, amended Settlement Agreement § 1 (defining "TAA Note") & § 7.C.iii.

19.     The 2008 Settlement Agreement also called for Ford to make a series of fifteen annual installment payments, called the "Base Amount" payments, each in the amount of $52.3 million, beginning in April 2008. *See* Dkt. # 63-6, 2008 Settlement Agreement § 7.D.v.[2]

20.     Under the 2008 Settlement Agreement, the Committee would have sole responsibility to determine the scope and level of benefits under the New Plan; it could, in its discretion and based on financial, actuarial, clinical, and/or efficiency considerations, raise or lower the level of post-retirement medical benefits available to beneficiaries. The only constraint was that the level of benefits was to remain the same until December 31, 2011. *See id.* § 5.B; *see also* Dkt. # 48-3, 2008 Form of Trust Agreement, § 10.2.d. Moreover, in exercising its authority over benefit design, the Committee was to "be guided by the principle that the Plans should provide substantial health benefits for the duration of the lives of all participants and beneficiaries." *See* Dkt. # 48-3, 2008 Trust Agreement § 10.2(b).

## C. Amendments to the 2008 Settlement Agreement

*New Note A and New Note B*

---

[2]The 2008 Settlement Agreement further provides that Ford shall transfer the assets (or, in the case of illiquid assets, equivalent alternatives) of the Existing Internal VEBA to the New VEBA on or shortly after the Implementation Date. See Ex. B, 2008 Settlement Agreement § 8.A & § 12.B. The 2008 Settlement Agreement also provides that the assets of the Existing External VEBA (established pursuant to the *Hardwick I* Settlement Agreement) shall be transferred to the New VEBA on or shortly after the Implementation Date. Id. § 12.C. Neither of these provisions of the 2008 Settlement Agreement is affected by the proposed amendments.

21.    The amended Settlement Agreement contemplates two new notes:  a New Note A and a New Note B (collectively, the "New Notes").  *See* Dkt. # 61-3, amended Settlement Agreement § 1 (defining "New Note A" and "New Note B").  The New Notes will replace the Convertible Note, the Term Note, the TAA Note (collectively, "the Prior Notes"), and the "Base Amount" payments scheduled to occur on or after December 31, 2009.  *See id.* § 7.C & § 12.E.  Together, these obligations represent the majority of Ford's existing payment obligations to the New VEBA on or after December 31, 2009.

22.    New Note A is an amortizing guaranteed secured note maturing June 30, 2022, with an initial principal amount of $6,705,470,000.  *See id.* § 1 (defining "New Note A");  *see also* Dkt. # 63-1, New Note A.  New Note B is an amortizing guaranteed secured note maturing June 30, 2022, with an initial principal amount of $6,511,850,000.  *See* Dkt. # 61-3, amended Settlement Agreement § 1 (defining "New Note B");  *see also* Dkt. # 63-2, New Note B.

23.    Ford will settle the amounts due with respect to New Note A in cash.  *See* Dkt. # 63-1, New Note A § 2.a.  For New Note B, Ford will settle the amounts due either in cash or at Ford's option with shares of Ford common stock of equivalent value based on the stock price in accordance with the terms of New Note B (the "Stock Payment Option"), including certain conditions described below that were negotiated for the protection of the New VEBA and the Class.  *See* Dkt. # 63-2, New Note B § 2.b & § 2.c.

24.    The New Notes will be issued as soon as practicable after the later of (i) the Amendment Effective Date (the date on which this court enters orders approving the Amendment Agreement, including the proposed Trust Agreement Amendment attached

as Exhibit 3 thereto, and the revised class definition), *see* Amendment Agreement § 3.c, or (ii) November 30, 2009.  *See* Dkt. # 61-3, amended Settlement Agreement §§ 7.C.iv-v; Dkt. # 63, Securities Exchange Agreement § 1 (defining the "Exchange Date").  At the same time, the Prior Notes will be cancelled and returned to Ford and Ford's obligation to make Base Amount payments also will terminate.  *See* Dkt. # 61-3, amended Settlement Agreement §§ 7.C.i-iii & § 7.D.v.

25.      Under the amended Settlement Agreement, payments on the Prior Notes and payment of future "Base Amount" payments would be replaced by payments under the New Notes, which would begin on December 31, 2009.  *Id.* §§ 7.C.iv-v.[3]

26.      The aggregate initial principal amount of New Note A and New Note B (i.e., $13.2 billion) and the amortization thereof reflected in their respective payment schedules approximate the equivalent present value of (i) the principal amounts of and interest payments on the Prior Notes, (ii) any unpaid annual $52.3 million "Base Amount" payments, and (iii) an additional $25 million per year during the period 2009 through 2018, which is intended to cover transaction costs the New VEBA may incur in selling any shares of Ford common stock delivered under the Stock Payment Option or upon the exercise of the Warrants (discussed below).  Dkt. # 61, Mem. in Supp. Of Jt. Mot. for Prelim. Approval at 13-14.

27.      UAW and Class Counsel negotiated certain conditions to settling the payment obligations under New Note B in shares of Ford common stock for the purpose

---

[3]Under the amended Settlement Agreement, certain other transfers to the TAA will have occurred prior to December 31, 2009.  Those payments will occur as scheduled.  The proposed amendments also do not affect payments to be made to the New VEBA from the assets of Ford's Existing Internal VEBA, the TAA (other than through the TAA Note), or the Existing External VEBA.

of protecting the New VEBA and the Class.  One of those conditions is that Ford must satisfy its obligations under New Note B in cash at any time that its common stock price is below $1 per share.  *See* Dkt. # 63-2, New Note B § 2.d.viii.  If Ford's common stock price is at least $1 per share and if (subject to other negotiated conditions in New Note B) Ford exercises the option to satisfy a scheduled payment by delivering its common stock, the number of shares that it must deliver to the New VEBA will be based on the price at which Ford common stock traded over the 30 trading days immediately preceding the scheduled payment date.  *Id.*

*The Warrants*

28.      The amended Settlement Agreement also provides that Ford will issue Warrants to acquire 362,391,305 shares of Ford common stock pursuant to a Warrant Agreement, which is attached as Exhibit C to the Securities Exchange Agreement.  *See* Dkt. # 63-3, Warrant Agreement § 2.01.a.  The Warrants will allow the New VEBA to purchase these shares of Ford common stock at an initial Exercise Price of $9.20 per share.  They are provided in order to preserve for the New VEBA the economic option value embedded in the Convertible Note that was part of the 2008 Settlement Agreement.  If Ford's stock price should recover and exceed $9.20, the New VEBA would be able to share in that upside gain by exercising its rights under these Warrants.

*Registration rights and hedging restrictions*

29.      The amended Settlement Agreement contains detailed provisions for the New VEBA (acting through an independent fiduciary) to sell stock that Ford delivers to the New VEBA.  The amended Settlement Agreement provides a number of different mechanisms that the New VEBA may use to sell these shares, with certain limits that

are designed to mitigate any market impact, or any excessive downward pressure, on the price of Ford common stock, which would harm the New Plan, the New VEBA and Ford.

30.     Pursuant to a Security Holder and Registration Rights Agreement (the "Registration Rights Agreement"), Ford has agreed to provide one or more registration statements to allow the public sale of any Warrants (described below) and any Ford common stock delivered in settlement of Ford's payment obligations under New Note B or upon exercise of the Warrants (together, the "Registrable Securities"), subject to certain quarterly and annual limits.  *See generally* Dkt. # 61-6, Registration Rights Agreement.

31.      In addition, the Registration Rights Agreement permits sales pursuant to Rules 144 and 144A under the Securities Act of 1933, as amended, of up to 100 million shares per quarter.  *Id.* § 2.02.d.i.  And notwithstanding the quarterly and annual limits, sales of shares pursuant to Rule 144 and 144A on any day shall not exceed 15% of the average daily trading volume of Ford common stock for the trailing 30-trading-day period.  *Id.* § 2.02.e.  Collectively, these limitations – along with others – are designed to allow the New VEBA to obtain liquidity through the sale of Registrable Securities while mitigating any manipulative impact, or any excessive downward pressure, on the price of Ford common stock, which would harm the New VEBA, the New Plan and Ford.

32.      Finally, under the Registration Rights Agreement, hedging – for example, by selling short Ford common stock – is permitted with respect to (1) shares of Ford common stock previously received by the New VEBA upon settlement of New Note B, and (2) up to 25% of the shares of Ford common stock deliverable by Ford upon

settlement of New Note B on the next succeeding payment date under New Note B.  *Id.* § 2.02.c.  However, no hedging activity is permitted under clause (2) above during the 30 trading days ending on the second business day prior to such payment date.  *Id.* These limitations are designed to allow hedging by the New VEBA while also mitigating any manipulative impact, or any excessive downward pressure, on the price of Ford common stock during the valuation period for Ford common stock delivered upon settlement of New Note B.

*Amended Trust Agreement*

33.      The proposed amendments also amend the 2008 Trust Agreement, changing the date when the Committee could begin to modify retiree benefits under the New Plan.  Under the 2008 Settlement Agreement and the 2008 Trust Agreement, the level of benefits provided to the Class Members under the New Plan would remain the same until December 31, 2011, after which the Committee would have sole responsibility to determine the scope and level of benefits.  *See* Dkt. # 63-6, 2008 Settlement Agreement § 5.B.  Under the amended Settlement Agreement, the 2008 Trust Agreement would be amended to eliminate this restriction.  *See id.* § 5.B; Dkt. # 63-5, Trust Agreement Amendment §§ 10, 13-15.

34.      The parties agreed to this provision because the assets that will be transferred to the New VEBA from the Existing Internal VEBA and from the Existing External VEBA have suffered losses in the financial markets over the last twelve months.  As a result, the assets in the New VEBA to fund the New Plan at the beginning of 2010 will not have the value that was assumed for them when the 2008 Settlement Agreement was negotiated and approved.  For that reason, the Committee may need

14

flexibility to redesign benefits earlier than 2012 in order to meet the long-range objective of providing substantial lifetime benefits to all members of the Class and the Covered Group who depend on the New Plan, funded by the New VEBA, for their retiree medical benefits. *See* Dkt. # 69, Mem. in Supp. of Jt. Mot. for Final Approval at 5.

### D. Department of Labor's Requested Non-Material Additional Provision

35.     Certain of the transactions contemplated by the proposed amendments require an exemption from the prohibited transaction restrictions of ERISA. Under ERISA, an employee welfare benefit plan like the New Plan is generally prohibited from engaging in certain transactions involving parties in interest (commonly referred to as prohibited transactions) in order to protect the plan and its participants and beneficiaries. *See generally* 29 U.S.C. § 1106. ERISA and its related regulations, however, authorize the Department of Labor ("DOL") to grant exemptions or variances to those prohibited transactions. *See* 29 U.S.C. § 1108(a); 29 C.F.R. §§ 2570.30-2570.52.

36.     Following this court's Preliminary Approval Order, Ford filed with the DOL an application requesting exemption from the prohibited transaction restrictions implicated by certain transactions contemplated by the amended Settlement Agreement. The Prohibited Transaction Exemption ("PTE") must be granted (or Ford and the New VEBA must receive reasonable assurance of retroactive regulatory relief from the DOL that is reasonably satisfactory to Ford and the New VEBA) before Ford can transfer the New Notes and other Ford securities described in the amended Settlement Agreement to the New VEBA  and engage in certain other transactions contemplated by the amended Settlement Agreement.

37.    In connection with Ford's PTE application, the DOL requested that the parties agree to additional non-material interest and transition provisions not addressed in the 2008 Settlement Agreement or the proposed amendments.  In carrying out the 2008 Settlement Agreement as amended by the proposed amendments, responsibility for providing retiree health benefits will shift from Ford to the New Plan on January 1, 2010 (provided this court approves the Amendment Agreement prior to this date).  During the transition period and thereafter payments between Ford and the New VEBA may occur arising from the mispayment of benefit claims, expense accruals and any true-up payments associated with the transfer of the TAA and mistaken payments by Ford to the New VEBA.  All of these types of payments and transfers are set forth in the 2008 Settlement Agreement and in the proposed amended Settlement Agreement.

38.    As a condition to granting exemptions for these types of payments or transfers, the DOL asked the parties to agree that, with respect to any mispayments of benefit claims, TAA expense accruals and true-up payments or other mistaken payments, the parties would follow a process for determining claims for such payments and agree to the payment of interest on such amounts.  The applicable interest rate is the Official British Banker's Association 6 Month London Interbank Offered Rate (LIBOR) 11:00 AM GMT fixing as reported on Bloomberg page "BBAM," a commonly used short-term interest rate.  These provisions are set forth in a form of side letter agreement among the parties, which is attached as Exhibit 4 to the parties' Joint Motion for Final Approval (Dkt. # 69-5).  The DOL's requested provisions supplement and do not modify any provision of the 2008 Settlement Agreement or the proposed amendments.  And because they apply to any covered payment, whether it is made by

Ford to the New VEBA or vice versa, they do not constitute either a benefit or a detriment to either Ford or the New VEBA.

39.        Apart from this condition imposed by the DOL, there are no other agreements requiring disclosure that were "made in connection with the proposal." *See* Fed. R. Civ. P. 23(e)(3).

### E.  Updated Class Certification

40.        In connection with the parties' motion  for preliminary approval of the proposed amendments, the class representatives, Bobby Hardwick, Walter Berry, Raymond J. Mitchell, Fay Barkley, Arlen Banks, Yvonne Hicks, and Bruce Carrier ("Class Representatives") separately moved to modify the class definition in order to include in the class those retirees, and their eligible spouses and dependents, who retired from Ford between the cut-off date included in the original class definition (November 19, 2007) and August 15, 2009.

41.        On April 7, 2008, this court entered an order approving these plaintiffs as Class Representatives of a Class defined as:

> (i)     Ford-UAW Represented Employees who, as of November 19, 2007, were retired from Ford with eligibility for Retiree Medical Benefits under the Ford Retiree Health Plan, and their eligible spouses, surviving spouses and dependents;

> (ii)    surviving spouses and dependents of any Ford-UAW Represented Employees who attained seniority and died on or prior to November 19, 2007 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from Ford and/or under the Ford Retiree Health Plan;

> (iii)   former Ford-UAW Represented Employees or UAW-represented employees who, as of November 19, 2007, were retired from any previously sold, closed, divested or spun-off Ford business unit with eligibility to receive Retiree

17

Medical Benefits from Ford and/or the Ford Retiree Health
Plan by virtue of any agreement(s) between Ford and the
UAW, and their eligible spouses, surviving spouses, and
dependents; [and]

(iv)    surviving spouses and dependents of any former Ford-UAW
Represented Employee or UAW-represented employee of a
previously sold, closed, divested or spun-off Ford business
unit, who attained seniority and died on or prior to November
19, 2007 under circumstances where such employee's
surviving spouse and/or dependents are eligible to receive
Retiree Medical Benefits from Ford and/or the Ford Retiree
Health Plan.

Dkt. # 30, Order Granting Class Representatives' Mot. for Class Certification.

42.    Under the modification, the Class definition continues to cover all

members of the Class that was certified April 6, 2008, and expands to include those

former Ford-UAW represented employees who had attained seniority as of November

19, 2007, and their eligible spouses and dependents, and who, as of August 15, 2009,

were eligible to receive retiree medical benefits.  This expansion of the class is

consistent with the terms of the 2008 Settlement Agreement.  In addition to applying to

class members (as defined therein), the 2008 Settlement Agreement also applied to

members of the "Covered Group," who were essentially UAW active employees who

had attained seniority and *had not yet retired* as of November 19, 2007.  Thus, the

modified class definition intends to add to the Class those individuals who were in the

"Covered Group" as of November 19, 2007, but have since retired.

43.    On August 6, 2009, this court entered an order provisionally approving

the modified class definition, as follows:

(i)    Ford-UAW Represented Employees who had attained
seniority as of November 19, 2007, and who as of August
15, 2009, were retired from Ford with eligibility for Retiree

Medical Benefits under the Ford Retiree Health Plan, and their eligible spouses, surviving spouses and dependents;

(ii)    surviving spouses and dependents of any Ford-UAW Represented Employees who attained seniority as of November 19, 2007 and died prior to August 15, 2009 (under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from Ford and/or under the Ford Retiree Health Plan);

(iii)    former Ford-UAW Represented Employees or UAW-represented employees who had attained seniority as of November 19, 2007 and who, as of August 15, 2009, were retired from any previously sold, closed, divested or spun-off Ford business unit with eligibility to receive Retiree Medical Benefits from Ford and/or the Ford Retiree Health Plan by virtue of any agreement(s) between Ford and the UAW, and their eligible spouses, surviving spouses, and dependents; and

(iv)    surviving spouses and dependents of any former Ford-UAW Represented Employee or UAW-represented employee of a previously sold, closed, divested or spun-off Ford business unit, who attained seniority as of November 19, 2007, and died on or prior to August 15, 2009 under circumstances where such employee's surviving spouse and/or dependents are eligible to receive Retiree Medical Benefits from Ford and/or the Ford Retiree Health Plan.

Dkt. # 65, Order Provisionally Accepting Amended Class Definition. The court now grants final approval of the updated class definition.

### F. Class Notice

44.    The Preliminary Approval Order directed Ford to provide notice to members of the Class by mailing a notice to Class Members ("Class Member Notice") and by publishing an abbreviated form of notice in two daily newspapers, one national

and one regional ("Publication Notice").[4]   With the assistance of Garden City Group ("GCG"), a national class action administration firm, Ford delivered the Class Member Notice, in substantially the form approved by the court, by first class mail on August 24, 2009.  *See* Dkt. # 69-6, Fraga Decl. ¶¶ 4-6.

45.      The Class Member Notice explained the nature of the controversy and purposes of the amendments and summarized the changes under the amended Settlement Agreement.  It also informed Class Members of: their right to obtain complete copies of the settlement documents on the web or upon request in hardcopy and to object to the amended Settlement Agreement; the deadline for submitting objections; and the right of any Class Member who submitted a timely objection to appear and be heard at the fairness hearing on October 21, 2009.  *See id.*, Fraga Decl. Ex. A (sample notice packet); *see also* Fed. R. Civ. P. 23(e)(5).  The notice package mailed to the households of Class Members also included a letter from Class Counsel and UAW to Class Members, in substantially the form attached to the Preliminary Approval Motion as Exhibit G and approved by the court, explaining plaintiffs' reasons for supporting the proposed amended Settlement Agreement.  *See* Dkt. # 69-6, Fraga Decl. ¶ 4.

46.      The initial mailing on August 24, 2009 was sent to 120,529 households containing a total of 195,264 individual Class Members.  *Id.* ¶ 6.  Of this number, only 1,715 Class Notice Packets, less than 2% of the number mailed, were returned as

---

[4]  Consistent with the practice employed in connection with the 2008 proceedings, the Preliminary Approval Order provided that to the extent that there is more than one Class Member in a household, Ford could send a single notice to such household.

undeliverable without a forwarding address.  *Id.* ¶ 8.  Those that were returned with a forwarding address were remailed.  *Id.*

47.    The Publication Notice was published in the <u>Detroit Free Press</u> on Sunday, August 23, 2009.  It was also published in <u>USA Today</u> on Friday, August 21, 2009.  *See* Dkt. # 69-7, Moog Decl. ¶ 4 & Exs. A & B.  In both newspapers, the Publication Notice appeared in the main news section as a full-page legal notice.  *Id.* ¶ 4.

48.    GCG also carried out the notice required under the Class Action Fairness Act to the Attorney General of the United States and the Attorneys General of each of the fifty states and of the District of Columbia ("CAFA Notice").  *See* Dkt. # 69-6, Fraga Decl. ¶ 10.  Each CAFA Notice was mailed on July 27, 2009, and included a computer disk containing all statutorily-required pleadings and documents, as well as a computer disk with the names of Class Members from all 50 United States, the District of Columbia, U.S. Territories and foreign countries.  *Id.*  A copy of the CAFA Notice is attached to the Fraga Declaration as Exhibit B.

## G. Objections

49.    Out of a total of 195,264 Class Members, only 38 submitted timely objections (and two untimely) in response to the Class Member Notice and Publication Notice.  *See* Dkt. # 69-4, Payne Decl. Ex. A, Class Member Objections.  That is a tiny percentage – only about 1/50th of one percent of the total.  The majority of the objections either provided no information about the reasons for the Class Member's objection or appeared to object to any settlement at all (including the existing one).  *See, e.g., id.,* Class Member Objections at 5, 9, 11, 16.  None of these objections

addresses the specific amendments the parties have proposed, and none provides any

basis for doubting the fairness of the proposed amendments.

50.      Only eight of the 40 objections refer to any of the specific amendments

now under consideration by the court.  Five objections (four with identical text), object to

the Stock Payment Option under New Note B out of concern over the volatility of stock

markets.  *See id.* at 2, 30, 34, 38, 42.  These objections state that instead of paying the

New VEBA in Ford common stock, Ford should liquidate the stock and pay the New

VEBA in cash.  Because the New VEBA can liquidate the shares of Ford common stock

it receives, subject to certain reasonable conditions, these five objections do not cast

doubt on the fairness of the proposed amendments.  Moreover, the proposed

amendments provide the New VEBA with $25 million per year during the period 2009

through 2018 to mitigate the transaction costs that the New VEBA might incur in

liquidating Ford common stock.

51.      Four objections (including one of the objections to the Stock Payment

Option discussed above) concern the proposed modification to the New VEBA Trust

Agreement that would allow the Committee to adjust benefit levels before January 1,

2012.  *See id.* at 1, 2, 27, 29.  The court appreciates these objectors' concerns that their

benefits may be modified earlier than 2012.  The parties agreed to this provision,

however, because certain assets that will be transferred to the New VEBA have

suffered losses in the financial markets over the last twelve months.  As a result, the

assets in the New VEBA to fund the New Plan at the beginning of 2010 will not have the

value that was assumed for them when the 2008 Settlement Agreement was negotiated

and approved.  For that reason, the Committee may need flexibility to redesign benefits

earlier than 2012 in order to meet the long-range objective of providing substantial lifetime benefits to all members of the Class and the Covered Group who depend on the New Plan, funded by the New VEBA, for their retiree medical benefits.

### H. Fairness Hearing

52.    The court held a final fairness hearing on October 21, 2009. After the parties made their presentations, the court invited anyone present to speak. Two members of the audience addressed the court. One class member stated generally that he had difficulty obtaining information about the proposed amendments, but did not offer an objection or state any grounds for objection. Another audience member, who does not appear to be a class member, addressed the court for several minutes but did not refer to this litigation, the 2008 Settlement Agreement, or the proposed amendments to the 2008 Settlement Agreement.

### II. CONCLUSIONS OF LAW

### A. Final Approval of Amendments to Class Action Settlement

1.    The touchstone for approval of any class settlement is whether the proposed settlement "is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Int'l Union, UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) ("Before approving a settlement, a district court must conclude that it is 'fair, reasonable, and adequate'"), *aff'g Int'l Union, UAW v. Ford Motor Co.*, No. 05-CV-74730, 2006 WL 1984363 (E.D. Mich. July 13, 2006) ("*Hardwick I*'); *Leonhardt v. ArvinMeritor*, Inc., 581 F. Supp. 2d 818, 830 (E.D. Mich. 2008) ("To warrant district court approval, a class action settlement must be 'fair, reasonable, and adequate.'"); *In re Cardizem CD Antitrust Litig.*, 218

F.R.D. 508, 522 (E.D. Mich. 2003) (Edmunds, J.), *appeal dismissed*, 391 F.3d 812 (6th Cir. 2004).

2.    The same standard applies when considering an amendment to a previously-approved class settlement agreement.  *See, e.g., Gardner v. Lafarge Corp.*, No. 99-10176, 2007 WL 1695609, at *4 (E.D. Mich. June 12, 2007) (in approving amended settlement agreement, district court re-examined agreement following Rule 23(e)'s requirement that the amended settlement be "fair, reasonable, and adequate"), *aff'd, Olden v. Gardner*, 294 F. App'x 210 (6th Cir. 2008); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, No. Civ. A. 99-20593, MDL 1203, 2003 WL 21641957, at *7 (E.D. Pa. Mar. 12, 2003) (approving Sixth Amended Settlement Agreement as "fair, adequate, and reasonable" under same standards used to approve prior settlement agreements), *aff'd*, 385 F.3d 386 (3d Cir. 2004); *White v. Nat'l Football League*, 836 F. Supp. 1458, 1476, 1480, 1498 (D. Minn. 1993) (evaluating "the amended version of the Stipulation and Settlement Agreement and the requested factual findings under the same standard by which it evaluated the original Stipulation and Settlement Agreement"), *aff'd*, 41 F.3d 402 (8th Cir. 1994), *abrogated on other grounds, Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 618 (1997) ("White I"); *Harris v. Reeves*, 761 F. Supp. 382, 394 (E.D. Pa. 1991) ("Because the Stipulation and Agreement affect[ed] the interests and rights of the plaintiff class, the court decided to apply the same criteria for approval as it applied to the prior settlement.").

## B.  The Amendments to the 2008 Settlement Agreement are Fair and Reasonable

3.      In approving the 2008 Settlement Agreement, this court recognized the

very real dispute between the parties, concluding that the settlement represented a

reasonable compromise of that dispute.  *Hardwick II*, 2008 WL 4104329, at *23-25

(Conclusions of Law Nos. 21-31).  In its holding, this court noted the "[p]laintiffs ha[d]

concluded that risk of loss, even if unlikely, would produce consequences so grave that

they are worth avoiding through a settlement that continues comprehensive health care

benefits for the Class."  *Id.* (Conclusions of Law No. 26).  This court quoted the Sixth

Circuit on the grave stakes in *Hardwick I.*

> What makes these settlements particularly sensible, moreover, is that,
> even if this merits question favored one party over the other, the retirees
> still would have had ample reason to control the resolution of this dispute
> through negotiation today rather than litigation tomorrow.  If we decided for
> the sake of argument that the retirees were likely to lose the *Yard-
> Man/Sprague* debate, little would stand in the way of the car companies'
> reducing or even eliminating the retirees' healthcare benefits in the future.
> If we decided for the sake of argument that the retirees were likely to win
> the debate, any such victory would run the risk of being a Pyrrhic one
> because the cost of insisting on irreversible healthcare benefits might well
> be – and indeed almost certainly would be – the continuing downward
> spiral of the companies' financial position.  If GM's automotive divisions
> lost $11.4 billion in 2005 while spending $3.7 billion to pay retiree
> healthcare benefits (and Ford's division lost $3.9 billion while spending
> $2.4 billion on retirees), it takes little imagination to picture the future
> financial toll this burden would place on the two companies.  While we
> need not embellish the point by raising the prospect of bankruptcy, it is
> well to remember that the Federal Government's Pension Benefit
> Guaranty Corporation, which provides <u>pension</u> guarantees for the
> employees and retirees of financially distressed companies, has no sister
> agency that provides the same guarantees for retiree <u>healthcare</u> benefits.

*Id.* at *24 n.4 (quoting *Hardwick I*, 497 F.3d at 632-33 (some citations omitted).)

4.      The amendments are necessary to reduce the risk that Ford will be unable

to meet its obligations to the New VEBA under the 2008 Settlement Agreement, given

the economic downturn that has had such a harsh impact on the domestic automobile

industry.  If there were any default by Ford in the payment of those obligations, the retirees would face a very substantial risk that their benefits would be reduced below the level of benefits that they are now receiving, as well as a significant risk that they would lose their benefits entirely.  In light of these risks, UAW and Class Counsel have concluded that the amended Settlement Agreement, like the original one, provides considerable benefits to the Class and plainly "fall[s] within the range of possible approval[.]"  *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. at 350.

5.      The amendments to the 2008 Settlement Agreement are designed to reduce credit risk under the 2008 Settlement Agreement while maintaining the value of Ford's payment obligations to the New VEBA on a present-value basis to the maximum extent possible.  Ford's completed debt restructuring reduces the risk that Ford will be unable to satisfy its obligations to the New VEBA.

6.      The amended Settlement Agreement also provides mechanisms by which the Committee can sell any common stock that Ford may issue under New Note B or upon exercise of the Warrants, while guarding against excessive market impact that could be generated by sales of large quantities of Ford common stock.  The court finds the amended Settlement Agreement, including the Trust Agreement Amendment, to be fair and reasonable.

### C. The Amendments to the 2008 Settlement Agreement Were the Product of Arm's-Length Negotiations

7.      Courts presume "that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands." *Hardwick I*, 497 F.3d at 628 (citing *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 308 (3d Cir. 2005).)  That presumption is not defeated unless there is "evidence of improper

26

incentives for the class representatives or class counsel – such as a promise of excessive attorney fees in return for a low-cost, expedited settlement." *Id.* at 628; 4 *Newberg on Class Actions* § 11:51 at 158-59.  In this case, experienced counsel negotiated at arm's length and there is no basis on which to identify any deficiencies or inequities.

8.    UAW for decades has negotiated on behalf of Ford hourly employees. *See Hardwick I*, 497 F.3d at 627-28 (observing that Ford and UAW are "not known historically as congenial negotiating allies" and describing UAW's efforts to protect retirees' benefits).  In connection with negotiations between Ford and UAW, UAW and its financial and legal advisors engaged in further review and analysis of Ford's financial condition given the economic conditions facing the automotive industry and its effect on Ford's ability to meet its payment obligations to the New VEBA, absent any debt restructuring.  They determined that the restructuring contemplated by the amended Settlement Agreement will reduce credit risk and thereby improve the ability of the New Plan, funded by the New VEBA, to provide benefits over the long term in accordance with the amended Settlement Agreement.  *See* Amendment Agreement § 3.  Class Counsel and their retained experts also participated in this review and negotiations and conducted their own independent evaluation.  *Id.*  Based on these investigations, plaintiffs and their counsel have concluded that the amended Settlement Agreement is in the best interest of the Class.

9.    The informed and reasoned judgment of plaintiffs' counsel, and their weighing of the relative risks and benefits of the proposed amendments, merit substantial deference.  *See Hardwick I*, 497 F.3d at 626 (given Mr. Payne's background,

the class "would have been hard pressed to find someone with greater 'experience in handling class actions . . . and claims of the type asserted in the action' or an attorney with more 'knowledge of the applicable law.'") (quoting Fed. R. Civ. P. 23(g)(1)(A)(iii)); *see also Hardwick I*, 2006 WL 1984363, at *20; *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 597 (E.D. Mich. 2006).

### D.  Notice to the Class

10.    In approving a proposed settlement agreement, a district court "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Notice of an amendment to a class settlement and an opportunity to object may be required when the amendment will effectuate a material change in the settlement terms.  *See, e.g., Gardner*, 2007 WL 1695609, at *2 (court provided re-notice to absentee class members of terms of the proposed amended settlement agreement and allowing them to file objections); *In re Diet Drugs*, 2003 WL 21641957, at *9 (providing class with notice of amendments to class settlement and an opportunity to object thereto); *White v. Nat'l Football League*, 836 F. Supp. 1508, 1510 (D. Minn. 1993) (same), *aff'd*, 41 F.3d 402 (8th Cir. 1994) ("*White II*").

11.    This court has "virtually complete discretion" in determining what constitutes reasonable notice of a class settlement under Rule 23(e), in form as well as method.  7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1797.6 (3d ed. 2005).  "All that the notice must do is 'fairly apprise the prospective members of the class of the terms of the proposed settlement' so that class members may come to their own conclusions about whether the settlement serves their interests."  *Hardwick I*, 497 F.3d at 630.  The notice's content should inform Class

Members of the terms of the proposed amendments to the settlement agreement, the identity of persons entitled to participate in the amended Settlement Agreement, and the options the Class Members have in connection with the proceedings. *See Carlough v. Amchem Prods., Inc.*, 158 F.R.D. 314, 332 (E.D. Pa. 1993) (citation omitted); *Manual on Complex Litigation* (Fourth) § 21.633 (West 2009). Such notice "should be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Leonhardt,* 581 F. Supp. 2d at 831 (quoting *UAW v. Gen. Motors*, 497 F.3d at 629).

12. Ford provided notice to the Class by First Class Mail and by publication. The Notice was easily understood, it succinctly and accurately summarized the terms of the amendments to the 2008 Settlement Agreement and informed class members of their rights – including their right to object to the amendments and to be heard at the fairness hearing on October 21, 2009. This notice was the best practicable under the circumstances and fully satisfied Rule 23's requirements.

13. The parties, through GCG, also provided the notice required under the Class Action Fairness Act to the Attorney General of the United States and the Attorneys General of each of the fifty states and of the District of Columbia.

### E. Objections to the Amendments to the 2008 Settlement Agreement

14. "A court should not withhold approval of a settlement merely because some class members object." *Int'l Union, UAW v. Gen. Motors Corp.*, No. 05-CV-73991-DT , 2006 WL 891151, at *20 (E.D. Mich. March 31, 2006) (citations omitted). This is because even though the court must evaluate any objections, it "has an

obligation to protect the interests of the silent class majority, despite vociferous opposition by a vocal minority to the settlement." *Id.* (citation omitted).

15.    After receiving notice of the proposed amendments to the 2008 Settlement Agreement, only thirty-eight (38) out of 195,264 Class Members (less than .01%) submitted an objection within the time period specified by the notice, and only two (2) submitted an objection after that deadline.  This level of objection is lower than even the level in *Hardwick I*, where less than one half of one percent of the Class Members submitted an objection.  This minimal level of objection is evidence of the adequacy of the settlement.  *Hardwick I*, 2006 WL 1984363, at *20; *In re Cardizem*, 218 F.R.D. at 527 ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.").

16.    The majority of the objections either provided no information about the reasons the Class Member objected or appeared to object to any settlement at all (including the existing one.)  *See* Class Member Objections at 5, 9, 11, 16.  As this court found in *Henry I*, "[b]ecause there is no way for the court to determine the basis for these objections or whether any such objections have merit, they are of little use." *Henry I Final Approval*, at *22 (citing *In re Rio Hair Naturalizer*, 1996 WL 780512, at *14 ("General objections without factual or legal substantiation carry little weight.") (quoting 4 *Newberg on Class Actions* § 11:58); *see also* 7B Wright, et al., *Fed. Prac. & Proc.* § 1797.1 ("Only clearly presented objections . . . will be considered.")).

17.    Of the eight objections which referred to the amendments to the 2008 Settlement Agreement, five objected to the Stock Payment Option under New Note B out of concern over the volatility of stock markets.  *See* Class Member Objections at 2,

30, 34, 38, 42. Another four objections concern the proposed modification to the New VEBA Trust Agreement that would allow the Committee to adjust benefit levels before January 1, 2012. *See* Class Member Objections at 1, 2, 27, 29. None of the objections casts doubt on the fairness of the amendments. The potential for stock market volatility is mitigated by the fact that the New VEBA can liquidate the shares of common stock it receives, subject to certain conditions. The ability of the Committee to adjust benefit levels before January 1, 2012 is necessary to meet the long range objective of providing substantial lifetime benefits to all members of the Class and the Covered Group who depend on the New Plan, funded by the New VEBA, for their retiree medical benefits.

18.     These objections, representing the individual views of just a few class members, do not call into question the court's determination that the amendments to the 2008 Settlement Agreement are fair, reasonable, and adequate, and should be approved.

### III.  CONCLUSION

The court finds that the amendments to the 2008 Settlement Agreement are fair, reasonable, and adequate. Accordingly,

IT IS ORDERED that the amendments to the 2008 Settlement Agreement are hereby APPROVED.

s/Robert H. Cleland_____
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: November 9, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, November 9, 2009, by electronic and/or ordinary mail.

s/Lisa G. Wagner_____
Case Manager and Deputy Clerk
(313) 234-5522